# KANSAS *v.* COLORADO.

### ORIGINAL.

No. 10. Original. Argued February 24, 25, 1902.—Decided April 7, 1902.

As the remedies resorted to by independent States for the determination of controversies raised by collision between them were withdrawn from the States by the Constitution, a wide range of matters, susceptible of adjustment, and not purely political in their nature, was made justiciable by that instrument.

Where a State on behalf of her citizens and in vindication of her alleged rights as an individual owner files a bill against another State to obtain

relief in respect of being wholly deprived by the direct action of the latter of the water of a river accustomed to flow through and across her territory, and the consequent destruction of her property, and of the property of her citizens and injury to their health and comfort, the original jurisdiction of this court may be exercised.

If it is a case of circumstances in which a variation between them as stated by the bill and those established by the evidence, might either incline the court to modify the relief or to grant no relief at all, the court, even though it sees that the granting of modified relief would be attended with considerable difficulty, will not support a demurrer.

The general rule is that the truth of material and relevant matters, set forth with requisite precision, are admitted by demurrer, but in a case of great magnitude, involving questions of grave and far-reaching importance, that rule will not be applied, and the case will be sent to issue and proofs.

THE State of Kansas, by leave of court, filed her bill of complaint against the State of Colorado on May 20, 1901, which, after stating that Kansas was admitted into the Union, January 29, 1861, and Colorado, August 1, 1876, averred:

That the Arkansas River rises in the Rocky Mountains in the State of·Colorado and flows through certain counties of that State, and thence across the line into the State of Kansas; its tributaries in Colorado have their rise and entire flow in that State; the length of the river therein is approximately two hundred and eighty miles, and the drainage area of the river and its tributaries approximately twenty-two thousand square miles. All of the drainage area is east of the summit of the Rocky Mountains and a large portion thereof in the mountains, where ·the accumulation of snow in the winter season is very great, the waters from the melting of which flow into the river directly and in great volume from early spring until August in each year. The river, after leaving the mountains of Colorado, proceeds in an easterly course for approximately two hundred miles to the west line of Kansas, and "is a navigable stream under the laws and departmental rules and regulations of the United States." The volume of water in the bed of the river flowing from Colorado into Kansas formerly was and should now be, and would be, very large, but for the wrongful diversion of the same ; said volume at its normal height in the river at the mean average flow for about ten months in the year being upwards of two thousand cubic feet per second, while it

is much less for about two months in the autumn in each year. The tributaries of the river in Kansas are comparatively few in number, and cannot furnish water to cause a continuous stream to flow in the bed of the river, except near the south line of the State, where the river passes into the Territory of Oklahoma. The river after entering Kansas proceeds through certain enumerated counties thereof, and then through the Territory of Oklahoma, the Indian Territory and the State of Arkansas, and empties into the Mississippi River at the eastern boundary of that State. From Fort Gibson, in the Indian Territory, to the mouth of the river it is a large, navigable stream, and is used for the purposes of trade and commerce by vessels plying thereon.

The length of the river in Kansas is about three hundred and ten miles; its course is through a broad valley, and along its entire length in Kansas are alluvial deposits of great depth, amounting in the aggregate to about two million five hundred thousand acres, the greater part of which acreage and the greater part of the course of the river lying in the western part of the State. The elevation of the bed of the river through the State of Kansas is from three thousand three hundred and fifty feet above the level of the sea at the Colorado line to one thousand feet above that level at the point where it enters Oklahoma. The rainfall in the drainage area in the western half of the State of Kansas is very light, and, by reason of the porous nature of the soil throughout that area, the greater portion of the water so falling sinks into the earth, and but a small portion thereof finds its way to the river except in the event of severe and unusual storms. The ordinary and usual rainfall in the major portion of the valley of the river in Kansas is utterly inadequate to the growing and maturing of cultivated crops of any kind, because the precipitation is very scanty, and does not fall during the growing season of the year.

The river in its entire course through the State of Kansas has a natural fall of about seven and three tenths feet per mile. Its valley is composed of sand covered with alluvial soil, and the river and the surface soil of the bottom lands in Kansas are all underlaid with sand and gravel, through which the waters of

the river have flowed from time immemorial, extending in-width under the entire valley for its whole length throughout the State, the natural course and flow of the river being in and beneath the bed thereof and beneath the surface of the bottom lands of the entire valley of the river, that portion which flows beneath the surface being called the "underflow." The "underflow" is confined to and is co-extensive with the valley, and varies in volume with the amount of water in discharge in the river. The water which flows in the river from Colorado into Kansas furnishes the principal and almost the entire supply of water for the underflow of the valley, and at its normal height the underflow is of great and lasting benefit to the bottom lands, both as to those which abut on the river and as to those which do not; and is of great benefit to the people owning and occupying such lands, "for that it furnishes moisture sufficient to grow ordinary farming crops in the absence of rainfall, and furnishes water at a moderate depth below the surface, for domestic use and for the watering of animals. The flow of the water in the riverbed is also of great value to the people in the vicinity by reason of the fact that the evaporation therefrom tends to cool and moisten the surrounding atmosphere, thereby greatly promoting the growth of all vegetation, enhancing the value of the lands in that vicinity, and conducing directly and materially to the public health and making the locality habitable. Owing to the dryness of the climate, the cloudlessness of the sky, the high elevation, and the prevailing winds, evaporation is rapid and great, being about sixty inches per annum at the east end of the river valley in Kansas, and ninety inches at the west line of the State. Outside of the valley in the western half of the State of Kansas are several million acres of arid upland and plateau upon which grows a sparse but valuable grass upon which cattle may feed, and upon which they have, in times past, in vast numbers, been fed and fattened, but the cattle so fed must have watering places and such watering places must be in the river valley. And the availability and use of said arid lands and the prosperity of the business of cattle feeding thereon depends entirely upon the water, its convenience, depth, and supply, and if the surface flow of water in

the bed of said river be wholly cut off from the State of Kansas, then the under flow will gradually diminish and run out, and the valley of the Arkansas River will become as arid and uninhabitable as is the upland and plateau along its course, since without said underflow the valley land will be unfit for cultivation, and the arid lands unavailable for grazing."

The bottom lands in the valley of the Arkansas River in Kansas " are practically level and rise from six to fifteen feet above the water bed of the river," and are such as are ordinarily termed " bottom lands." Nearly all of the bottom lands, including those which are adjacent to the bed of the river, are fertile and productive, valuable for farming purposes, and well adapted to the growing of corn, wheat, alfalfa, rye, etc., and " all like crops, grains and grasses usually grown in that latitude of the United States. In addition thereto, all of said lands are valuable for grazing purposes and well adapted to the support of vast numbers of cattle, horses, sheep, and hogs."

More than three fourths of these Kansas bottom lands were and are occupied by persons owning or leasing them, and residing thereon with their families; and more than two fifths, including more than two fifths of those on the river bank, are and have been for years in actual cultivation, with an agricultural population of more than fifty thousand, raising all products "common to the latitude and climate," while numerous cities, towns and villages are situated on the bank of the river, including ten county seats, with an aggregate population of over fifty thousand. The actual value of the Arkansas bottom lands averages not less than twenty-five dollars an acre, provided they receive the benefits arising from the natural and normal flow of the water of the river, but that by reason of the wrongful acts of the State of Colorado the value of the lands " has shrunk many millions of dollars, which has been a direct loss to the citizens of the State of Kansas, and to the taxable wealth, and to the revenues of the State of Kansas and to the school system of the State as hereinafter set forth."

The bill further averred that all of the bottom lands were originally part of the public domain of the United States, and that the State became entitled, on admission, for school purposes, to

sections sixteen and thirty-six of each township, some of which sections were situated within the valley, and a number of them adjoined the bed of the stream.   That under the act of Congress of March 3, 1863, there was granted to the State practically all of the odd-numbered sections of land in the valley lying north of a line four miles south of the north line of township twenty-six, and the grant included all the territory of the Arkansas valley west of Wichita, being four fifths of the valley ; that all the requirements of the act of Congress were complied with prior to 1874 by the State and by the Atchison, Topeka and Santa Fé Railroad Company, and the title in fee simple had been conveyed to the State and by the State to the railroad company and others, being not less than nine hundred thousand acres, a large portion of which abutted upon the river ; that the even-numbered sections had been at all times subject to entry and have been taken and occupied by settlers under the land laws.

Prior to the admission of Kansas there were many settlers and residents in the valley, occupying and holding lands there, more particularly along the line of the Santa Fé trail, which followed the river from the present site of the city of Hutchinson to the west line of the State, and during the years 1869, 1870 and 1871, the entire Arkansas valley, from the south line of the State to the city of Great Bend, was taken and occupied by actual settlers, who subsequently acquired title to the lands under the United States, the State, and the railroad company ; while the other valley lands from Great Bend to the west line of Kansas were taken up between 1872 and 1884, and have been since occupied by settlers and purchasers from the State and company.   All of the lands of the valley have been thus occupied, held and owned by the original settlers and their grantees, who have continuously held and owned all riparian and other rights in any way appertaining in or belonging to the lands.

The bill further averred that under an act of Congress of March 2, 1889, certain lots were transferred to the State of Kansas, and had been since used for the maintenance of a soldiers' home thereon, in accordance with the provisions of the

act; that these lands consisted of one hundred and twenty-six and fifty-six one hundredths acres of bottom lands of the valley, adjoining and abutting on the bed of the river, and were fertile and well adapted to the raising of fruits, grains and vegetables when supplied with moisture, but that the value thereof depended entirely on the flow of water in the bed of the river and on the underflow beneath the land. That the State was and had been during its entire ownership of the tract using a large portion of the same for raising grains, fruits, vegetables and grasses thereon for the needs of the institution, and as the owner was and had been since 1889 " entitled to the full, free and natural flow of all waters which naturally would flow in said river and beneath said land; and the rights of the State thereto are prior and superior to any right or claim of the State of Colorado accruing, acquired or established subsequent to said date."

It was also alleged that since 1885 the State of Kansas had been the owner of six hundred and forty acres situated in Reno County, on which it had erected a large institution for the purposes of an industrial reformatory, and that the greater portion of the lands were used for farming purposes in connection with the institution, and the production of grain, vegetables, etc., for its needs; that the lands are bottom lands in the valley of the Arkansas, furnished with moisture sufficient for the growing of crops thereon solely from the underflow of the river, the rainfall in ordinary seasons being entirely inadequate; and that the title of the State's grantors dated from 1873. And " by reason of the foregoing, the State of Kansas is entitled to the full natural flow of the water of the Arkansas River in its accustomed place and at its normal height and in its natural volume underneath all of the said reformatory lands. The rights of the State thereto relate back to May 19, 1873, and are prior and superior to any right or claim of the State of Colorado accruing, acquired or established subsequent to said date."

The bill further averred that the constitution of the State of Colorado provided in sections five and six of article sixteen as follows:

" SEC. 5. The water of every natural stream not heretofore

appropriated within the State of Colorado is hereby declared to be the property of the public, and the same is dedicated to the uses of the people of the State subject to appropriation as hereinafter provided.

"SEC. 6. The right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes."

That the legislature of Colorado has from time to time passed numerous laws purporting to authorize the diversion of water from the Arkansas River and its tributaries, in that State, for uses and purposes other than domestic; "more particularly for the purpose of irrigating arid and waste lands for agricultural purposes in said State." That in and by its laws and through its officers and courts Colorado has assumed "to grant to divers persons, firms and corporations the right and authority to divert the waters of the Arkansas River and its tributaries in Colorado from their natural channels, and to cause said waters to flow into and through canals and ditches constructed for the purpose, extending great distances away from the natural channels of said streams, and to store said waters and to empty the same upon high arid lands, not riparian to said streams, where large portions of such waters are lost from evaporation, and the remainder sinks into the earth, as a result of which, all of said waters are forever lost to such streams and are thus and thereby prevented from flowing into or through the State of Kansas."

That in pursuance of the constitutional provisions and the statutes of Colorado, many persons, firms and corporations claim to have acquired rights to divert water from the river and its tributaries for the purpose of irrigating arid, non-riparian lands in that State, each of them owning one or more ditches or canals, some being of great capacity and many miles in length.

And many of these persons, firms and corporations " have constructed great reservoirs within which to store, and in which are stored for use, vast quantities of the water of said streams before using it for the purpose of irrigation."

That these ditch owners and the State of Colorado are now diverting the waters flowing in the bed of the Arkansas River and its tributaries, and carrying them to great distances from their natural courses, and discharging them for agricultural purposes on "arid and non-riparian lands, where such waters are wholly lost to such streams and to the State of Kansas and its inhabitants. That such diversion is carried to such an extent that no water flows in the bed of said river from the State of Colorado into the State of Kansas during the annual growing season, and the underflow of said river in Kansas is diminishing and continuing to diminish, and if the said diversion continues to increase, the bottom lands of said valley will be injured to an enormous extent, and a large portion thereof will be utterly ruined and will become deserted and be a part of an arid desert."

That the State of Colorado, through its laws, legislatures, officers and agents, assumes to authorize canal and ditch owners to take, carry away, and so use the waters of the streams, and to regulate and control the distribution thereof to landowners for irrigation purposes; that other canals and ditches for the irrigation of arid, non-riparian lands are contemplated, and the extension of branches and laterals; that this system is being continuously carried on in the drainage area of the Arkansas valley, and that unless restrained therefrom Colorado will grant additional rights for the construction of other canals and ditches sufficient to divert all the water in the river so that none will flow into Kansas.

That Colorado has since 1890 constructed and owns and manages a great canal for diverting water of the Arkansas River from its channel, and using it on arid, non-riparian lands, so that it will not return to or again flow in the river; and the State permits its agents to divert into said canal water to the amount of seven hundred and fifty-six and twenty-eight one

hundredths cubic feet per second, which is approximately the natural flow of the river at the place of the diversion.

That the water so diverted is sold by the State of Colorado to persons owning lands in the vicinity and is used by such owners in irrigating arid, non-riparian lands, when but for the diversion it would flow into Kansas and through said valley.

That the State of Colorado is threatening to build, and will build unless restrained, other similar canals with the intention of diverting other large quantities of water from the river, and irrigating other arid, non-riparian lands, and the legislature of that State has authorized their construction; and the State of Colorado also intends to, and will, unless restrained, extend its existing canal and build branches and laterals.

That Colorado has by legislation appropriated large sums of money for the construction of reservoirs for the storage of water from the streams tributary to the Arkansas River, and provided for the control thereof, and the sale of the waters so stored for the irrigation of arid lands, non-riparian to the streams from which the waters are taken. That the State has constructed and is using four of such reservoirs holding vast quantities of water which would otherwise flow into the State of Kansas; and by reason of the use of those waters no portion thereof is permitted to return to its natural channel or flow in the river. That the State of Colorado is now preparing to construct, and intends to construct, and, unless restrained, will construct, at various points along the river and its tributaries, vast reservoirs in which to further store and hold the natural and flood waters of said stream; "and it is the intention and expectation of said State so to store and withhold and divert from the channel of said river all of the water thereof." That surveys for these reservoirs had been made and plans and specifications were being prepared for their construction, and the State is preparing to enter on the construction thereof. That if these reservoirs are so constructed by Colorado vast and enormous quantities of water which would otherwise flow into the State of Kansas will be taken and held and sold and used for the irrigation of arid and non-riparian lands not now irrigated, and will be forever lost to the river and the State of Kansas, which will cause in

Kansas in said valley a vast and ruinous decline in agriculture, and great diminution of the wealth and revenues of the State, and in its population and prosperity.

Complainant charged the facts to be "that it is the intention of the State of Colorado to divert absolutely all of the water that does, can or might flow down the Arkansas River into the State of Kansas, so that all of the water shall be used in the State of Colorado, and none whatever, either above or below the surface, that may by any possibility be utilized, shall cross the line into the State of Kansas, all to the great profit and advantage of the State of Colorado; and to the great damage and injury of the State of Kansas."

It was further stated that when the Territory of Kansas was organized in 1854 it extended from its present eastern boundary to the summit of the Rocky Mountains, and all of the present drainage area of the Arkansas River in Colorado was then included therein, and during all of the period from then to the organization of the State of Kansas the water of the river was wholly unappropriated, and the common law and the riparian rights herein claimed extended over the whole of the Arkansas valley and to the summits of the Rocky Mountains, and had for many years prior thereto. That by reason of the prior settlement, occupation and title of the inhabitants of Kansas upon and to the lands situated in the valley of said river, including those upon its banks, Kansas and the owners of land in the valley acquired, and now have the right to the uninterrupted and unimpeded flow of all the waters of the river into and across the State of Kansas; which rights accrued prior to any of the diversions by or in Colorado, and prior to the accruing of any of the rights claimed by that State, or by persons, firms or corporations therein now taking water from the river or its tributaries.

The bill further averred that the State of Colorado and the various persons, firms and corporations engaged in taking waters from the river and its tributaries under and in pursuance of authority granted by the State of Colorado, have by so doing wrongfully, illegally and unlawfully diverted the water from the accustomed channel across the State of Kansas, and have

greatly damaged and irreparably injured the State of Kansas and its inhabitants. That by reason of such diversion the fertility of all the valley lands in Kansas, including those on the river banks as well as others, has been greatly diminished, and the crops, trees and vegetation have languished and declined, and in many places perished, and wells which should furnish water for domestic use and animals have become dry. That these damages are the proximate and necessary result of the diversion of the waters, and that such damage amounts to vast sums annually, which damages have increased year by year for the past ten years, substantially in proportion as the diversion of the waters in the State of Colorado has increased.

It was also stated that by reason of the diversion of the waters as described, during the summer season and the dry portion of the year, the bed of the river in Kansas above the city of Wichita becomes practically, and oftentimes wholly dry, and because of the natural features of the territory through which the stream passes, which are set forth, the channel becomes filled up and great damage is inflicted at times of sudden and excessive rainfall in Kansas or sudden and excessive melting of snows in Colorado.

That the property of complainant, situated on the banks of the river and used for the purposes of a soldiers' home, has been greatly damaged and specially injured by reason of the diversion of the water, which would otherwise flow by and underneath the said tract of land, and unless the natural and normal flow is restored the value of the property will be entirely destroyed. And that the same is true of complainant's property used for the purposes of a state industrial reformatory.

The bill further averred that a large number of irrigation canals and ditches, now wrongfully used in diverting the waters of the Arkansas River and its tributaries from their accustomed channels in Colorado, are owned and operated by domestic corporations organized for that purpose under the laws of Colorado, with limited periods of existence, and that if Colorado be not restrained from doing so, she will grant extensions of the charters now held, and also grant other and new charters to corporations organized for the purpose of unlawfully and wrongfully

diverting and using said waters for irrigation purposes, all to the irreparable injury of the State of Kansas and its inhabitants.

The bill then prayed " that a decree may be entered probibiting, enjoining and restraining the State of Colorado from granting, issuing, or permitting to be granted or issued hereafter, any charter, license, permit or authority to any person, firm or corporation for the diversion of any of the waters of the Arkansas River or of any of its tributaries from their natural beds, courses and channels within the State of Colorado, except for domestic use; and from granting to any person, firm or corporation any right to extend or enlarge any of the canals or ditches now existing ; or to construct and operate any other canals, ditches, branches, laterals or reservoirs in addition to those heretofore constructed and now in use in said State."

" That the said State of Colorado may be prohibited, enjoined, and restrained, as a State, from itself constructing, owning, or operating, either directly or indirectly, any canal or ditch whereby the waters of said river, or any of its tributaries, shall be diverted from their natural courses and channels ; and from constructing, owning, operating or using any reservoir for the storage of the waters of said river, or any of its tributaries, for purposes of irrigation."

" That the said State of Colorado may be prohibited, enjoined and restrained from granting to any person, firm or corporation any extension of any charter, license, permit, or authority, of any kind or nature whatsoever, for the diversion of any of said waters from said river or its tributaries for irrigation purposes, or for the continuance of such diversion thereof after the charter, license, permit or authority theretofore granted for that purpose shall have expired."

And for general relief.

Thereupon, October 15, 1901, the State of Colorado, by leave, filed its demurrer to the bill of complaint, assigning the following causes :

" First. That this court has no jurisdiction of either the parties to or the subject matter of this suit because it appears on the face of said bill of complaint that the matters set forth

therein do not constitute, within the meaning of the Constitution of the United States, any controversy between the State of Kansas and the State of Colorado.

" Second. Because the allegations of said bill show that the issues presented by said bill arise, if at all, between the State of Kansas and certain private corporations and certain persons in the State of Colorado who are not made parties herein and which matters so stated, if true, do not concern the State of Colorado as a corporate body or State.

" Third. Because said bill shows upon its face that this suit is in reality for and on behalf of certain individuals who reside in the said State of Kansas on the banks of the Arkansas River and that although the said suit is attempted to be prosecuted for and in the name of the State of Kansas, said State is in fact loaning its name to said individuals and is only a nominal party to said suit and that the real parties in interest are the said private parties and persons residing in said State.

" Fourth. Because it appears from the face of said bill that the State of Kansas in her right of sovereignty is seeking to maintain this suit for the redress of the supposed wrongs of certain private citizens of said State while under the Constitution of the United States and the laws enacted thereunder, said State possesses no such sovereignty as empowers it to bring an original suit in this court for such purposes.

" Fifth. Because it appears upon the face of said bill of complaint that no property rights of the State of Kansas are in any manner affected by the matters alleged in said bill of complaint; nor is there any such property right involved in this suit as would give this court original jurisdiction of this cause.

" Sixth. Because it appears from the face of said bill of complaint that the acts complained of are not done by the State of Colorado or under its authority, but by certain private corporations and individuals against whom relief is sought and who are not made parties herein.

" Seventh. The bill is multifarious in this, to wit : that thereby the State of Kansas seeks to determine the claims of the State of Kansas as a riparian owner against the claims of the State of Colorado as an appropriator of water; the claims of the State

of Kansas as a riparian owner against the separate and severable claims of numerous undisclosed Colorado appropriators of water; the separate and severable claims of various disclosed and undisclosed riparian claimants in Kansas against the claims of the State of Colorado as an appropriator of water; and the separate and severable claims of various disclosed and undisclosed riparian claimants in Kansas against the separate and severable claims of numerous undisclosed Colorado appropriators; and otherwise, as is apparent from the bill.

"Eighth. Because the acts and injuries complained of consist of the exercise of rights and the appropriation of water upon the national domain in conformity with and by virtue of divers acts of Congress in relation thereto.

"Ninth. Because the constitution of the State of Colorado declaring public property in the waters of its natural streams and sanctioning the right of appropriation was enacted pursuant to national authority and ratified thereby at the time of admission of the State into the Union.

"Tenth. Said bill of complaint is in other respects uncertain, informal and insufficient and does not state facts sufficient to entitle the State of Kansas to the equitable relief prayed for."

The demurrer was set down for argument, and duly argued February 24 and 25, 1902.

*Mr. A. A. Godard* and *Mr. Eugene F. Ware* for the State of Kansas. *Mr. S. S. Ashbaugh* was on their brief.

*Mr. Luther M. Goddard, Mr. Platt Rogers* and *Mr. Charles S. Thomas* for the State of Colorado. *Mr. Charles C. Post* and *Mr. Henry A. Dubbs* were on their brief.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The original jurisdiction of this court over " controversies between two or more States " was declared by the judiciary act of 1789 to be exclusive, as in its nature it necessarily must be.

Reference to the language of the Constitution providing for

its exercise, to its historical origin, to the decisions of this court in which the subject has received consideration, which was made at length in *Missouri* v. *Illinois*, 180 U. S. 208, demonstrates the comprehensiveness, the importance and the gravity of this grant of power, and the sagacious foresight of those by whom it was framed. By the first clause of section 10 of article I of the Constitution it was provided that " No State shall enter into any treaty, alliance, or confederation ; " and by the third clause that " No State shall, without the consent of Congress, . . . keep troops, or ships of war in time of peace, enter into any agreement or compact with another State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."

Treaties, alliances and confederations were thus wholly prohibited, and Judge Tucker in his Appendix to Blackstone (vol. 1, p. 310) found the distinction between them and " agreements or compacts " mentioned in the third clause, in the fact that the former related " ordinarily to subjects of great national magnitude and importance, and are often perpetual, or made for a considerable period of time," but agreements or compacts concerned " transitory or local affairs, or such as cannot possibly affect any other interest but that of the parties." But Mr. Justice Story thought this an unsatisfactory exposition, and that the language of the first clause might be more plausibly interpreted " to apply to treaties of a political character, such as treaties of alliance for purposes of peace and war ; and treaties of confederation, in which the parties are leagued for mutual government, political coöperation, and the exercise of political sovereignty ; and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges ; " while compacts and agreements might be very properly applied " to such as regarded what might be deemed mere private rights of sovereignty ; such as questions of boundaries ; interests in land situate in the territory of each other ; and other internal regulations for the mutual comfort and convenience of States bordering on each other." 2 Story, Const. §§ 1402, 1403 ; *Louisiana* v. *Texas*, 176 U. S. 1.

Undoubtedly as remarked by Mr. Justice Bradley in *Hans*

v. *Louisiana*, 134 U. S. 1, 15, the Constitution made some things justiciable, " which were not known as such at the common law ; such, for example, as controversies between States as to boundary lines, and other questions admitting of judicial solution." And as the remedies resorted to by independent States for the determination of controversies raised by collision between them were withdrawn from the States by the Constitution, a wide range of matters, susceptible of adjustment, and not purely political in their nature, was made justiciable by that instrument.

In *Missouri* v. *Illinois and The Sanitary District of Chicago*, 180 U. S. 208, it was alleged that an artificial channel or drain constructed by the sanitary district for purposes of sewerage under authority derived from the State of Illinois, created a continuing nuisance dangerous to the health of the people of the State of Missouri, and the bill charged that the acts of defendants, if not restrained, would result in poisoning the water supply of the inhabitants of Missouri, and in injuriously affecting that portion of the bed of the Mississippi River lying within its territory. In disposing of a demurrer to the bill, numerous cases involving the exercise of original jurisdiction by this court were examined, and the court, speaking through Mr. Justice Shiras, said : " The cases cited show that such jurisdiction has been exercised in cases involving boundaries and jurisdiction over lands and their inhabitants, and in cases directly affecting the property rights and interests of a State. But such cases manifestly do not cover the entire field in which such controversies may arise, and for which the Constitution has provided a remedy ; and it would be objectionable, and, indeed, impossible, for the court to anticipate by definition what controversies can and what cannot be brought within the original jurisdiction of this court. An inspection of the bill discloses that the nature of the injury complained of is such that an adequate remedy can only be found in this court at the suit of the State of Missouri. It is true that no question of boundary is involved, nor of direct property rights belonging to the complainant State, but it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the

State is the proper party to represent and defend them. If Missouri were an independent and sovereign State all must admit that she could seek a remedy by negotiation, and, that failing, by force. Diplomatic powers and the right to make war having been surrendered to the general government, it was to be expected that upon the latter would be devolved the duty of providing a remedy and that remedy, we think, is found in the constitutional provisions we are considering. The allegations of the bill plainly present such a case. The health and comfort of the large communities inhabiting those parts of the State situated on the Mississippi River are not alone concerned, but contagious and typhoidal diseases introduced in the river communities may spread themselves throughout the territory of the State. Moreover substantial impairment of the health and prosperity of the towns and cities of the State situated on the Mississippi River, including its commercial metropolis, would injuriously affect the entire State. That suits brought by individuals, each for personal injuries, threatened or received, would be wholly inadequate and disproportionate remedies, requires no argument."

As will be perceived, the court there ruled that the mere fact that a State had no pecuniary interest in the controversy, would not defeat the original jurisdiction of this court, which might be invoked by the State as *parens patriæ*, trustee, guardian or representative of all or a considerable portion of its citizens; and that the threatened pollution of the waters of a river flowing between States, under the authority of one of them, thereby putting the health and comfort of the citizens of the other in jeopardy, presented a cause of action justiciable under the Constitution.

In the case before us, the State of Kansas files her bill as representing and on behalf of her citizens, as well as in vindication of her alleged rights as an individual owner, and seeks relief in respect of being deprived of the waters of the river accustomed to flow through and across the State, and the consequent destruction of the property of herself and of her citizens and injury to their health and comfort. The action complained of is state action and not the action of state officers in abuse or excess of their powers.

The State of Colorado contends that, as a sovereign and independent State, she is justified, if her geographical situation and material welfare demand it in her judgment, in consuming for beneficial purposes all the waters within her boundaries; and that as the sources of the Arkansas River are in Colorado, she may absolutely and wholly deprive Kansas and her citizens of any use of or share in the waters of that river. She says that she occupies toward the State of Kansas the same position that foreign States occupy toward each other, although she admits that the Constitution does not contemplate that controversies between members of the United States may be settled by reprisal or force of arms, and that to secure the orderly adjustment of such differences, power was lodged in this court to hear and determine them. The rule of decision, however, it is contended, is the rule which controls foreign and independent States in their relations to each other; that by the law of Nations the primary and absolute right of a State is self-preservation; that the improvement of her revenues, arts, agriculture and commerce are incontrovertible rights of sovereignty; that she has dominion over all things within her territory, including all bodies of water, standing or running, within her boundary lines; that the moral obligations of a State to observe the demands of comity cannot be made the subject of controversy between States; and that only those controversies are justiciable in this court which, prior to the Union, would have been just cause for reprisal by the complaining State, and that, according to international law, reprisal can only be made when a positive wrong has been inflicted or rights *stricti juris* withheld.

But when one of our States complains of the infliction of such wrong or the deprivation of such rights by another State, how shall the existence of cause of complaint be ascertained, and be accommodated if well founded? The States of this Union cannot make war upon each other. They cannot "grant letters of marque and reprisal." They cannot make reprisal on each other by embargo. They cannot enter upon diplomatic relations and make treaties.

As Mr. Justice Baldwin remarked in *Rhode Island* v. *Mas-*

*sachusetts :* " Bound hand and foot by the prohibitions of the Constitution, a complaining State can neither treat, agree, nor fight with its adversary, without the consent of Congress; a resort to the judicial power is the only means left for legally adjusting, or persuading a State which has possession of disputed territory, to enter into an agreement or compact, relating to a controverted boundary. Few, if any, will be made, when it is left to the pleasure of the State in possession; but when it is known that some tribunal can decide on the right, it is most probable that controversies will be settled by compact." 12 Pet. 657, 726.·

" War," said Mr. Justice Johnson, " is a suit prosecuted by the sword ; and where the question to be decided is one of original claim to territory, grants of soil made *flagrante bello* by the party that fails, can only derive validity from treaty stipulations." *Harcourt* v. *Gaillard*, 12 Wheat. 523, 528.

The publicists suggest as just causes of war, defence ; recovery of one's own ; and punishment of an enemy. But as between States of this Union, who can determine what would be a just cause of war ?

Comity demanded that navigable rivers should be free, and therefore the freedom of the Mississippi, the Rhine, the Scheldt, the Danube, the St. Lawrence, the Amazon, and other rivers has been at different times secured by treaty ; but if a State of this Union deprives another State of its rights in a navigable stream, and Congress has not regulated the subject, as no treaty can be made between them, how is the matter to be adjusted ?

Applying the principles settled in previous cases, we have no special difficulty with the bare question whether facts might not exist which would justify our interposition, while the manifest importance of the case and the necessity of the ascertainment of all the facts before the propositions of law can be satisfactorily dealt with, lead us to the conclusion that the cause should go to issue and proofs before final decision.

The pursuit of this course, on occasion, is thus referred to by Mr. Daniell (p. 542): " The court sometimes declines to decide a doubtful question of title on demurrer; in which case, the demurrer will be overruled, without prejudice to any question.

A demurrer may also be overruled, with liberty to the defend-ant to insist upon the same defence by answer, if the allegations of the bill are such that the case ought not to be decided without an answer being put in. . . . . A demurrer will lie wherever it is clear that, taking the charges in the bill to be true, the bill would be dismissed at the hearing; but it must be founded on this: that it is an absolute, certain, and. clear proposition that it would be so; for if it is a case of circumstances, in which a minute variation between them as stated by the bill, and those established by the evidence, may either incline the court to mod-ify the relief 'or to grant no relief at all, the court, although it sees that the granting the modified relief at the hearing will be attended with considerable difficulty, will not support a demur-rer."

Without subjecting the bill to minute criticism, we think its averments sufficient to present the question as to the power of one State of the Union to wholly deprive another of the benefit of water from a river rising in the former and, by nature, flow-ing into and through the latter, and that, therefore, this court, speaking broadly, has jurisdiction.

We do not pause to consider the scope of the relief which it might be possible to accord on such a bill. Doubtless the spe-cific prayers of this bill are in many respects open to objection, but there is a prayer for general relief, and under that, such ap-propriate decree as the facts might be found to justify, could be entered, if consistent with the case made by the bill, and not. inconsistent with the specific prayers in whole or in part, if that were also essential. *Tayloe* v. *Merchants' Insurance Company*, 9 How. 390, 406; Daniell, Ch. Pr. (4th Am. ed.) 380.

Advancing from the preliminary inquiry, other propositions of law are urged as fatal to relief, most of which, perhaps all, are dependent on the actual facts. The general rule is that the truth of material and relevant matters, set forth with re-quisite precision, are admitted by demurrer, but in a case of this magnitude, involving questions of so grave and far-reaching im-portance, it does not seem to us wise to apply that rule, and we must decline to do so.

The gravamen of the bill is that the State of Colorado, act-

ing directly herself, as well as through private persons thereto licensed, is depriving and threatening to deprive the State of Kansas and its inhabitants of all the water heretofore accustomed to flow in the Arkansas River through its channel on the surface, and through a subterranean course, across the State of Kansas; that this is threatened not only by the impounding, and the use of the water at the river's source, but as it flows after reaching the river. Injury, it is averred, is being, and would be, thereby inflicted on the State of Kansas as an individual owner, and on all the inhabitants of the State, and especially on the inhabitants of that part of the State lying in the Arkansas valley. The injury is asserted to be threatened, and as being wrought, in respect of lands located on the banks of the river; lands lying on the line of a subterranean flow; and lands lying some distance from the river, either above or below ground, but dependent on the river for a supply of water. And it is insisted that Colorado in doing this is violating the fundamental principle that one must use his own so as not to destroy the legal rights of another.

The State of Kansas appeals to the rule of the common law that owners of lands on the banks of a river are entitled to the continual flow of the stream, and while she concedes that this rule has been modified in the Western States so that flowing water may be appropriated to mining purposes and for the reclamation of arid lands, and the doctrine of prior appropriation obtains, yet she says that that modification has not gone so far as to justify the destruction of the rights of other States and their inhabitants altogether; and that the acts of Congress of 1866 and subsequently, while recognizing the prior appropriation of water as in contravention of the common law rule as to a continuous flow, have not attempted to recognize it as rightful to that extent. In other words, Kansas contends that Colorado cannot absolutely destroy her rights, and seeks some mode of accommodation as between them, while she further insists that she occupies, for reasons given, the position of a prior appropriator herself, if put to that contention as between her and Colorado.

Sitting, as it were, as an international, as well as a domestic

tribunal, we apply Federal law, state law, and international law, as the exigencies of the particular case may demand, and we are unwilling, in this case, to proceed on the mere technical admissions made by the demurrer.   Nor do we regard it as necessary, whatever imperfections a close analysis of the pending bill may disclose, to compel its amendment at this stage of the litigation.   We think proof should be made as to whether Colorado is herself actually threatening to wholly exhaust the flow of the Arkansas River in Kansas; whether what is described in the bill as the " underflow " is a subterranean stream flowing in a known and defined channel, and not merely water percolating through the strata below; whether certain persons, firms, and corporations in Colorado must be made parties hereto; what lands in Kansas are actually situated on the banks of the river, and what, either in Colorado or Kansas, are absolutely dependent on water therefrom; the extent of the watershed or the drainage area of the Arkansas River; the possibilities of the maintenance of a sustained flow through the control of flood waters ; in short, the circumstances, a variation in which might induce the court to either grant, modify, or deny the relief sought or any part thereof.

The result is that in view of the intricate questions arising on the record, we are constrained to forbear proceeding until all the facts are before us on the evidence.

*Demurrer overruled, without prejudice to any question, and leave to answer.*

Mr. Justice Gray did not hear the argument, and took no part in the decision.