Argued April 26, decided June 7, 1910.

## CITY OF McMINNVILLE v. HOWENSTINE.

[109 Pac. 81.]

Eminent Domain—Rights of Cities—Water Sources Outside City Limits.

Section 2, Article XI, Constitution of Oregon, as amended in 1906, provides that the legislative assembly shall not enact, amend, or repeal any charter or municipal act of incorporation, but that the legal voters of every city and town are granted power to enact and amend their municipal charter subject to the State's constitution and criminal laws. Pursuant to such provision, complainant city amended its charter so as to provide that its water and light commission should have power to acquire by condemnation proceedings all necessary rights of way over the lands of any person or persons for the pipe line for its water plant, and to extinguish riparian rights that might otherwise interfere therewith, to be conducted in the same manner as condemnation proceedings for railroad rights of way are conducted.   Section 5108, B. & C. Comp., declares that any incorporated city or town may appropriate to public use any private real property, water, or water course, and that such appropriation may extend beyond its corporate limits, to be made in the manner prescribed by the act.   *Held*, that complainant city had power to appropriate by eminent domain the water flowing from certain springs across defendant's land situated without its corporate limits.

From Yamhill:   George H. Burnett, Judge.

This is an action by the City of McMinnville against Frederick G. Howenstine and Mary Howenstine, his wife, to appropriate to plaintiff's use the waters flowing across defendants' land from certain springs owned by the plaintiff, the water to be used for the inhabitants of the City of McMinnville.   The proceeding was authorized by an amendment to the charter of the City of McMinnville adopted at the general city election, held on the first Monday in September, 1907. The defendants interposed a general demurrer to the complaint which was sustained and the action dismissed, the defendants urging that the people of McMinnville could not, by an amendment of its

charter, confer upon the municipality the right to assume and exercise the power of eminent domain. But one question is involved in this appeal and that is, has the plaintiff, under the amended charter, the power to condemn and extinguish water rights where the same are needed in order to obtain an adequate supply of water for the wants of the inhabitants of the city. From the order sustaining the demurrer and dismissing the action, plaintiff appeals.

REVERSED.

For appellant there was a brief with oral arguments by *Mr. George G. Bingham* and *Mr. Roswell L. Conner.*

For respondents there was a brief over the names of *Messrs. McCain & Vinton,* with oral arguments by *Mr. James McCain* and *Mr. W. T. Vinton.*

MR. JUSTICE KING delivered the opinion of the court.

This is an action by the city of McMinnville to appropriate by eminent domain the water flowing from certain springs across defendant's lands situated outside of the corporate limits. A demurrer to the complaint was sustained on the ground that it did not state facts sufficient to constitute a cause of action, a judgment being entered thereon, from which this appeal is taken.

The point intended to be tested by the demurrer, and here presented for consideration, is whether the city may exercise the right of eminent domain in its behalf, without first having received from one of the legislative branches of the State express or specific authority therefor. In 1906, Section 2 of Article XI of the Constitution of Oregon was amended to read as follows:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city, or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the State of Oregon."

Pursuant to the provisions of this amendment, the city of McMinnville amended its charter, among other things providing:

"The water and light commission shall have power to acquire by purchase or condemnation proceedings, in the name of the city of McMinnville, or otherwise, all necessary right of way over the lands of any person or persons for the pipe line and wire for the said water plant and electric light plant, and also to extinguish all riparian rights which would otherwise interfere with the establishment and use of said water plants. Where condemnation proceedings are necessary to obtain said right of way, or to extinguish any riparian rights, the said proceedings shall be instituted by the commission in the name of the city of McMinnville as plaintiff, and shall be conducted in the same manner as proceedings for the condemnation of land or right of way for railroads, as provided by the laws of the State of Oregon."

It is forcibly argued by defendant's counsel that the amendment to our State constitution was not intended, and is insufficient, to authorize a municipality to exercise the right of eminent domain, without having first been sanctioned by legislative enactment. Plaintiff, on the other hand, maintains that such constitutional amendment clearly grants this power. The question is here presented for the first time, and so far as we can learn, has not been suggested in its present form for the consideration of any of the courts of this country. We are cited to decisions, hereinafter to be considered, from Missouri, Minnesota, and Washington, where the question was presented in part; but in each of those cases the attempted exercise of this power was within the corporate limits of the municipality, while here the city seeks to exercise outside of its corporate limits the right to appropriate water for consumption therein. The question as to whether this prerogative may be exercised at all by municipalities, without legislative aid, will first be considered.

Prior to the adoption of the amendment quoted, this power, both within and without the corporate limits, was by the legislature frequently delegated to the various municipalities as demanded, the validity of which is no longer open to question. 28 Cyc. 703, 704. Charters were amended, cities incorporated, new territories included therein, other territories excluded therefrom, and the charters changed from time to time to suit the will of the legislative department, which in many instances, and too frequently, was exercised without reference to the will or wishes of the majority of those affected thereby. This is a matter of history, and it is well known, and a fact of which we will take knowledge, that it was to alleviate these conditions and to give to the cities and towns home rule, as nearly as practicable, placing within the power of those affected and directly interested the right to make such changes, conducive to their interest and general welfare, as they might view it, that the amendment (Section 2, Article XI) of our organic law was adopted. It is argued that, since the rights and privileges of municipal corporations consist of enumerated powers only, the amendment is not sufficiently clear and explicit to indicate any intent on the part of the people to delegate to the municipality this high attribute of sovereignty. This court, in *Straw* v. *Harris*, 54 Or. 424, 436 (103 Pac. 777), recently held that the "power to enact local legislation may be delegated, but this of necessity, whether stated or not, is always limited to matters consonant with, and germane to, the general purpose and object of the municipalities to which such prerogatives may be granted." It must also be noted that no definite rule can be laid down by which to determine when any incorporation may or may not come within this limitation; this must be ascertained from the conditions in each case as they may arise. That the construction of waterworks for the use of the citizens of any

municipality is germane to and necessarily incident to the health and prosperity, as well as essential to the continued growth and existence, of our cities, there is no room for discussion. Authorities are divided, however, on the question as to whether the procuring of a system of waterworks for a city comes within what is known as the general police powers; the division on the subject probably being due to precedents established in the early history of the country, when, owing to the nature and condition of things, the necessity therefor was not so imperative as under the modern and more advanced conditions of recent periods, the reasons for which are obvious. But under the rapid growth and complexity of municipal governments of later years, with the advanced knowledge and improved methods for the prevention of epidemics, as well as protection against destruction by fires, etc., it would seem that without question the procurement of a pure and abundant supply of water is as much an incident to city government, and equally as essential to the security of the health, life, and success of its inhabitants, as is the maintenance of a police force. The difference lies, not in the ultimate effect, but in the class of dangers sought to be obviated. See *State ex rel. Ryan* v. *Ramsey County,* 87 Minn. 146, 151 (91 N. W. 300), holding to the same effect.

The people are the paramount source of all legislative power exercised within the State, and whether they may invoke this power through direct legislation, either in the manner provided by the initiative and referendum amendment, or through the system recognized from the inception of our government (the system of direct legislation, presumed to be more substantial and lasting, and known as the constitutional method), they are limited only in so far as their powers may be abridged by the federal consitution. The federal constitution is a sufficient guard against any legislative system that might become sub-

versive of the principles of a republican form of government, such as, for example, a perpetual surrender of State sovereignty to the municipalities, etc. *Straw* v. *Harris,* 54 Or. 424, 436 (103 Pac. 777.) So long as these and other inhibitions of the national Constitution are not invaded, the people by legislation, whether by amendment to the constitution or otherwise, may delegate local legislation and other powers to the incorporated cities and towns. These principles are well established. *Sturgess* v. *Crowninshield,* 4 Wheat. 120, 191 (4 L. Ed. 529) ; *St. Louis* v. *Western Union Tel. & Tel. Co.,* 149 U. S. 465 (13 Sup. Ct. 990: 37 L. Ed. 810) ; *In re Andrew Pfahler,* 150 Cal. 71 (88 Pac. 270: 11 L. R. A. (N. S.) 1092) ; *Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710: 75 Pac. 222) ; *Farrell* v. *Port of Portland,* 52 Or. 582 (98 Pac. 145.) But in the absence of any clear and express declaration to that effect, by the source from which the authority emanates, only those powers incident and germane to the city government may be deemed delegated, and they are always subject to control and regulation by the lawmaking department in the manner provided by the constitution. It is also to be remembered that these public corporations, although capable of adopting and amending their own charters for the purposes of State government, continue to be mere agencies and departments of government, in like manner as before the change in our fundamental law upon the subject; the system initiated by this amendment in no respect affects the nature of their relation to the State. The change thus made was for the double purpose of relieving the legislature of the long-standing and rapidly increasing burden imposed upon that body at each session, and at the same time to prevent the too often recurring incident of charters and amendments thereto being unwillingly and unadvisedly thrust upon the people of these localities to their prejudice as well as, in many instances, to their material

injury.  As a solution of this problem, the people, through their sovereign power expressed at the polls, have, by amendment of the fundamental law, transferred those special powers from the legislative department to the particular localities directly affected, leaving only a general control thereof in the legislative assembly; at the same time retaining, under the initiative and referendum, all power over them; differing only in the manner of the exercise of this supervision, which supervision lies with the people at large as a legislative branch of the State. In other words, the legislative assembly, as one of the State's lawmaking branches, may by general laws control and regulate all of its municipalities, while the people, through the direct method provided, may enact either general or special laws for this purpose.  *Straw* v. *Harris*, 54 Or. 424 (103 Pac. 777.)

Would it be reasonable, then, to hold that our cities and towns, before being permitted to exercise the right of eminent domain, must await the action of the legislature, by the enactment of some general law applying to all the cities of the State?  To do so would be to say that no city may exercise this right without the same privilege being extended to all incorporated towns.  Such has never been the course pursued in this State.  It has been the policy, since the inception of our government, to grant to the cities such rights only when by the legislature deemed proper and advisable; doing so only as the occasion might arise; specially and not generally.  To change from this well-settled policy, and say that no city shall exercise this prerogative without granting it to all, whether demanded by other localities or not, it is obvious would be done only by the use of language clearly and expressly indicating such intent, and not by leaving it to inference.  The language used is not only wanting in this respect, but it appears reasonably clear that such was not the intent. As before stated, this power by general enactments the

legislature has; but there is a manifest design to deprive it of the power to enact any special legislation on the subject. If, then, it was not intended to permit municipalities to assert this right, when deemed proper by the majority of the citizens thereof, in the event the legislature fails to provide a general law on the subject, including therein all such localities, the only way left open .for any public incorporations of this character, when desiring to open or widen streets, provide for waterworks, or make other public improvements, when the price of property essential to be taken for the purpose cannot be agreed upon, would be to initiate and submit a bill to the people of the entire State, which could occur only every two years, else submit to the extortion of the individual owner. This system, as stated, would permit any person whose property might be affected to block all improvements of the class mentioned, whether so to do would endanger the public health or not. And when we take into consideration the fact that questions of this character constantly arise, together with the impracticability of awaiting in each instance the action of the entire people over matters usually, if not always, local in their nature, it can hardly be presumed it was intended that the public health, progress, and prosperity of the numerous cities and towns springing up over our State, and the rapid growth of those heretofore established, should be impeded in this manner, especially without some clear and express terms manifesting a purpose to incorporate such a sluggish municipal policy into our State constitution. The change was obviously intended to aid and not to embarrass these auxiliaries of state. It would seem, therefore, that it was the intention of this amendment to our fundamental law to leave this matter, like all others bearing directly and indirectly upon the existence and maintenance of these public corporations, to be determined by the people directly affected thereby; and, if it should at any time be

disclosed that their powers in this and other respects were subject to abuse, to leave them subject to circumscription, and all dangers thereafter obviated, by the legislative department of the State in the manner hereinbefore indicated. *Ohio & Miss. R R. Co.* v. *Brubaker,* 47 Ill. 462. "No general rule," says Mr. Lewis, in his work on Eminent Domain (Section 240), "can be laid down as to when the right to condemn will be implied or inferred, and when not. Such implication will more readily be made in favor of public corporations, exercising powers solely for the public use and benefit, than in favor of private individuals or corporations organized for pecuniary profit." Also *Leitzsey* v. *Water Power Co.,* 47 S. C. 464, 476 (25 S. E. 744: 34 L. R. A. 215.)

The confusion in the application of these principles to the case at bar arises largely from the change in our constitution being new, and to a great extent untried, making it difficult at first to appreciate that the legislature has been deprived of any possible interference with municipalities by special enactments, as heretofore, and forgetting that the power to exercise this sovereigntial attribute is with the entire people, and that it is always within their power to assert this prerogative, through their municipal agencies, when and in such manner as they may deem best. As held in *Mt. Pleasant* v. *Beckwith,* 100 U. S. 514, 524 (25 L. Ed. 699), municipalities derive their powers from the legislature, "except where the constitution of the state otherwise provides." Here the constitution has made full provision upon the subject. Our municipalities, therefore, under the present status of our laws, do not owe their right to exercise the powers incident to their government and existence to the legislature, but retain and assert them by virtue of the amendment to the fundamental law enacted by the entire people. "Hence," as stated by Mr. Justice Lovely in *State ex rel.* v. *Ramsey County,* 87 Minn. 149 (91 N. W. 302), "the

statement that the right to exercise the sovereign power of eminent domain by the State, though strictly true, means exactly that it is reserved to the people, but the people may change their fundamental law by the methods prescribed therein in any manner not subversive of a republican form of government, or in any way that does not prescribe aristocratic or monarchical innovations"— citing *Hopkins* v. *City of Duluth,* 81 Minn. 189 (83 N. W. 536.) See, also, *In re Andrew Pfahler,* 150 Cal. 71 (88 Pac. 270: 11 L. R. A. (N. S.) 1092.) In the case from which the foregoing excerpt is taken, the court had under consideration the question whether St. Paul, under its new charter, could exercise the right of eminent domain. The charter was adopted pursuant to a constitutional amendment, authorizing cities and villages to frame their own charters, the purport of which was in effect analogous to the one here presented. This charter contained appropriate and effective provisions to condemn land for public use, as to which it was urged "that, the authority to take private property to improve the thoroughfares of the city being inherent in the State, there must be specific authority directly conferred by the legislature to authorize the exercise of this right," which had not been expressly given; hence that the condemnation there contested was illegal, and the assessments void. In considering this point, the court, in an opinion by Mr. Justice LOVELY, say:

"It is true that the right of eminent domain is not expressed in the constitution; hence, if it exists, it must be inherent. But we surmise that relator's counsel have not sufficiently discriminated between that which is inherent in the State and that which is inaccurately assumed to be inherent in the constitution, for the constitution must not be confounded with the State, nor with the absolute rights reserved to its people."

After following this observation by the language contained in the above excerpt, and after making further remarks along that line, the opinion continues:

"But the people being the paramount source of power, it likewise follows that the legislature does not confer this right absolutely, nor beyond the reserved power of the people to confer it upon municipalities or their governing bodies, when by the fundamental law the legislative authority is abridged or changed in that respect by a different distribution or new gift of governmental authority.    Upon a similar contention to that urged here under an amendment to the organic law of Missouri, which is the prototype of our own home-rule amendment to the constitution, the Supreme Court of that state held the following language, which we approve and adopt:    'The people * * in their sovereign capacity and by their organic law, could delegate to the people of a municipality this power to frame a charter for its own local government as to matters falling properly within municipality regulation. * * Such right is entirely in accord with the genius of our institutions bringing the regulation and government of local affairs within the observation of those who are to be affected thereby, and at the same time preventing the officious and selfish intermeddling with the charters of our cities without the knowledge of those whose rights are affected.    This court, regarding the constitution as supreme in authority, maintained the validity of the special charter adopted by Kansas City on April 8, 1889, in *State* v. *Field,* 99 Mo. 352 (12 S. W. 802.)'*Kansas* v. *Marsh,* 140 Mo. 458, 467 (41 S. W. 943.) The validity of the home-rule article in the Missouri constitution has been acknowledged by the Supreme Court of the United States, who held that a charter framed under it was an organic act of the municipality, to be construed as organic acts are construed; also, that a city incorporated thereunder was in a very just sense an *'imperium in imperio,'* whose powers were self-appointing"—citing *St. Louis* v. *Western Union Tel. Co.,* 149 U. S. 465 (13 Sup. Ct. 990: 37 L. Ed. 810.)

See, also *Hopkins* v. *City of Duluth,* 81 Minn. 189 (83 N. W. 536) ; *In re Andrew Pfahler,* 150 Cal. 71 (88 Pac. 270: 11 L. R. A. (N. S.) 1092) ; *Kadderly* v. *Portland,* 44

Or. 118 (74 Pac. 710: 75 Pac. 222) ; *State* v. *Pacific States Tel. & Tel. Co.,* 53 Or. 163 (99 Pac. 427.)

The Supreme Court of Washington appears to reach a conclusion at variance with the foregoing authority. See *City of Tacoma* v. *State,* 4 Wash. 64 (29 Pac. 487). In that case, however, it incidentally appears that provision was made by the legislature for the exercise of the right of eminent domain by the cities of the first, third, and fourth classes; all reference thereto being omitted as to the second class. The inclusion of these powers in one group of cities, and exclusion therefrom in the other, evidently had much weight with the court in the determination there announced. But whatever may have been the points upon which the conclusion of that court was predicated, we are not in accord with the views there enunciated.

This brings us to a consideration of the question whether the right of eminent domain may, in the manner provided for in the McMinnville charter, extend beyond the city limits. In this connection it is argued with much emphasis that it was never intended that a municipality could, whenever it desires to appropriate the property of a citizen of the State, whether within or without its limits, declare its wishes, and at the same time provide the manner for accomplishing them. At first blush this position would appear tenable, but it overlooks the fact that, as above shown, it is competent for the people of the State, by constitutional amendment, to delegate to the municipalities this power, making it a question of policy in which the State alone is concerned, and not the courts. *In re Andrew Pfahler,* 150 Cal. 71, 92 (88 Pac. 270: 11 L. R. A. (N. S.) 1092).

When we take into account the object to be attained by the new system, the reasons for which are heretofore discussed, it is clear that the delegation of this power is essential to the full accomplishment of the object sought;

nor is its exercise new or novel, except to the extent that its use in this manner by these auxiliaries of the State is of recent origin. In this connection it will be observed, also, that it is not an individual exercise of power, nor is it possible that it may be exercised for private gain, but is exercised for and by a group of citizens through the instrumentality of a municipal government, and then only when the majority thereof so declare. The inhabitants of a municipality are as much interested in using this power sparingly as the State may be in so desiring. They must pay the taxes incurred thereby, and any extravagance in this respect could only inure to their injury, which for obvious reasons must necessarily, to a large extent at least, afford ample protection against the abuse of this privilege. Again, as before observed, to be available, the use must be a public one, before the right may be exercised. The question as to when a proposed project or improvement is of sufficient public importance to entitle the exercise of the right of eminent domain is always for the courts, to be determined from the evidence adduced in support thereof; only the propriety or expediency of the appropriation, with the extent thereof, being within the legislative discretion of the body authorized to legislate thereon: *Dallas* v. *Hallock,* 44 Or. 246 (75 Pac. 204). Thus it will be seen that the mere right of a municipality, through the declaration of a majority of its citizens, to be its own judge as to when it may and shall institute proceedings for the condemnation of property, does not, as the suggestion might imply, mean that the use for which the property may be desired is a public one, or that it necessarily follows that the citizen is thereby deprived of his property. It merely amounts to a decision on its part to move in the matter, and to a decision as to the manner in which it will proceed, which must necessarily be reasonable and in conformity with the fundamental laws of the State and nation. The State

and the nation act in the same manner; each exercises the right of determining when they may proceed in the courts against a citizen, whether for condemnation of his property, or otherwise, even to the institution, in some instances, of proceedings by a state outside of its boundaries against a citizen of and in another state: *Kohl* v. *U. S.,* 91 U. S. 367 (23 L. Ed. 449) ; *Cherokee Nation* v. *Kansas Ry. Co.,* 135 U. S. 641 (10 Sup. Ct. 965: 34 L. Ed. 295) ; *Kansas* v. *Colorado,* 185 U. S. 125, 146 (22 Sup. Ct. 552: 46 L. Ed. 838) ; *Kansas* v. *Colorado,* 206 U. S. 46 (27 Sup. Ct. 655: 51 L. Ed. 956). And since the State may delegate, subject to its control, the exercise of this prerogative, it is but reasonable to assume that it was intended that, although the use thereof by these local and inferior governments might also be instituted upon their own motion, this attribute of sovereignity should be delegated to the municipalities in the same manner and with equal effect as the right to legislate upon other questions incident and essential to the successful maintenance and operation of municipalities. Since the right thereof, under proper circumstances, to go outside of its boundaries for condemnation purposes, has long been recognized by the courts as one of the prerogatives which may be, and frequently has been, delegated thereto by special enactments of the legislature, it is evident that it was the intention of the framers of the amendment to include this privilege with the other rights of local legislation thereby granted, as to which interference by special enactments of the legislative assembly was intended to be and is inhibited. Were it held that this prerogative was intended to be invokable within corporate limits only, and that any attempt to exercise it outside of such limits was unconstitutional, it could in most instances readily be validated by extending the limits beyond and including the property desired, the tendency of which would be to take in property not needed for any other purpose, and

at the same time leave the objecting party in no better position, with reference to the property demanded of him, than if the power were delegated to the municipality in the first instance. Such holding, it will be seen, would necessarily lead to absurd results. If a city or town were suffering from, or threatened with, a pestilence, it would be powerless to take the steps essential to the alleviation of such and other dangers, real or threatened, but must await the initiation and submission of a bill to a vote of the people of the entire State, entailing a delay of from four to twenty-four months thereby, rendering fruitless in many instances, all efforts to that end. Manifestly such irrational consequences were not intended by this change in our fundamental law. To so hold would be to say that it was intended by this change to embarrass, and not to aid, municipal governments, and, that such was not intended is self-evident.

Since the announcement of the views declared in the authorities cited by respondent, our State has adopted a number of changes in its constitution, the provisions of which are given in full in *Farrell* v. *Port of Portland*, 52 Or. 582 (98 Pac. 145). The authorities thus relied upon are, accordingly, not in point. In the last-named case, this court had under consideration the question whether the people of the Port of Portland had the power, under the constitution as amended, by direct vote to alter the act incorporating the Port of Portland, etc. In discussing the amendment there, and here, involved, Mr. Chief Justice BEAN says: "But this section and the language used in it should not be construed alone; it is a part of the general initiative and referendum scheme first inaugurated by the amendment of 1902, and subsequently enlarged and extended by the amendments of 1906. All of these amendments, so far as they refer to the same subject-matter, should be read together, and be so interpreted as to carry out the purpose of the people

in adopting them." This purpose we have heretofore discussed, and, when considered with the constitution as a whole, we are of the opinion that it was designed by the amendment (Section 2, Article XI) to delegate the controverted authority to municipalities, subject to interference only by the general enactments of the legislative assembly, and subject to such supervision and control as may be exercised by the State through the initiative and referendum system, recently incorporated into and made a part of our Constitution.

The judgment will therefore be reversed and remanded for such further proceedings as may not be inconsistent with this opinion.          REVERSED.

MR. JUSTICE SLATER delivered the following concurring opinion.

I concur in the result announced in the majority opinion but dissent from the reasoning by which it is reached. The only question raised by the demurrer to the complaint is whether plaintiff, prior to the commencement of the action, had been invested with power to condemn private property, including water and water rights, beyond its corporate limits, for the purpose of constructing a municipal water plant to supply its inhabitants with water for domestic use. The complaint contains averments of certain charter powers to that purpose, incorporated into the municipal charter by initiative amendment adopted by the people of McMinnville on the first Monday of November, 1907.

It is contended by the defendants that the right of eminent domain is not inherent in a municipality; but it is admitted that such power may be conferred by appropriate legislation. This was clearly and expressly done by the act of February 21, 1891 (Laws 1891, p. 145), which is amendatory of the act of 1887 (Laws 1887, p. 145; Section 5108, B. & C. Comp.), to the general effect that any incorporated city or town of this State shall have

the right to appropriate to any public use or uses, for the general use or benefit of the people of such city or town, any private real property, water, water courses, and water and riparian rights; and that such appropriation may extend beyond the corporate limits to or along any adjacent or neighboring lake, spring, or stream; the appropriation to be made in the manner prescribed in that act. By the original act of 1887, that section was added to title 3, c. 7, of the Miscellaneous Laws (Deady & Lane Comp.), and it was provided therein that the added section should be numbered 53. The words "this act," found therein, are to be understood as referring to the act of 1862, forming the above title and chapter of the Deady Code, and chapters 1 and 2 of Title 41, B. & C. Comp., of which that section has become a part.

The averments of the complaint, intended to show special charter powers originating with the people of that municipality, and authorizing and empowering the city to exercise the right of eminent domain, are not, therefore, material, and are not to be considered, except in relation to the special limitation imposed by the said act to the exercise of such power. This limitation is in the form of a proviso to the act, "that in all cities containing less than fifteen thousand inhabitants, no action for the appropriation of private property or for the payment therefor, as allowed by this act, shall be taken by the council of such city or town, except a majority of the taxpayers of said city or town, voting at an election to be called and held for that purpose, have voted in favor of said action." Subsequent to the filing of the complaint this proviso was eliminated by the amendatory act of February 23, 1909 (Laws 1909, p. 243).

There is no averment that the city of McMinnville has a population of 15,000 inhabitants; but I am of the opinion that the special matter alleged is equivalent to an averment that the people of that city have, by a majority vote,

authorized such action, and therefore the complaint shows that the terms of the statute in that respect have been complied with, and states a good cause of action.

Mr. Chief Justice MOORE, Mr. Justice MCBRIDE and Mr. Justice EAKIN concur in the conclusions reached in each of the foregoing opinions.