UNITED STATES v. WINSLOW et al. (two cases).

(District Court, D. Massachusetts. March 2, 1912. On Petition for Rehearing, March 21, 1912.)

Nos. 113, 114.

1. INDICTMENT AND INFORMATION (§ 125*)—SHERMAN ANTI-TRUST ACT—CONSTRUCTION—INDICTMENT.

Sherman Anti-Trust Act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. · Comp. St. 1901, p. 3200]) provides that every ' person who shall make any contract in restraint of trade or commerce or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished, etc. *Held*, that the offense under such section permits in one count of an indictment an allegation of but a single transaction, to wit, the allegation of making one contract or engaging in one combination or conspiracy, although such a combination or conspiracy when once effected may be continuous.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 334–400; Dec. Dig. § 125.*]

2. INDICTMENT AND INFORMATION (§ 150*)—DEMURRER.

Where the questions raised by demurrer to an indictment are both intricate and doubtful, the demurrer may be overruled, and their decision postponed until the trial on the merits. Kansas v. Colorado, 185 U. S. 125, 22 Sup. Ct. 552, 46 L. Ed. 838.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 497; Dec. Dig. § 150.*]

3. CORPORATIONS (§ 369*)—OFFICERS—CRIMINAL LIABILITY.

Officers or directors of a corporation cannot protect themselves from criminal liability behind the corporate organization where they are the actual, present, and efficient actors in the commission of the offense.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1510; Dec. Dig. § 369.*]

4. CRIMINAL LAW (§ 59*)—MISDEMEANORS—PRINCIPALS.

All parties who are active in promoting a misdemeanor, whether agents or not, are indictable as principals.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 71–74, 76–81; Dec. Dig. § 59.*]

5. INDICTMENT AND INFORMATION (§ 106*)—ALLEGATION OF DOCUMENTS.

Where, in an indictment, it is necessary to plead numerous documents which in themselves were not directly the subject-matter of the litigation, it is not necessary to set out each instrument by its tenor.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 283; Dec. Dig. § 106.*]

6. MONOPOLIES (§ 31*)—INDICTMENT—INTENT.

The rule applied that an indictment for an illegal combination and conspiracy must necessarily allege facts in detail to enable the court to determine for itself whether or not the alleged combination or conspiracy is to be carried out by what are in truth unlawful methods.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

7. MONOPOLIES (§ 10*)—SHERMAN ANTI-TRUST ACT—CONSTITUTIONALITY.

Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901. p. 3200]), making it a criminal offense to make any contract or engage in any combination or conspiracy in restraint of interstate trade or commerce, or to monopolize, or attempt to monopolize, or conspire with any person to monopolize, any part of such trade or

commerce, was not unconstitutional for indefiniteness in so far as sought to form the basis of a criminal proceeding.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. § 10.*]

**8. INDICTMENT AND INFORMATION (§ 99\*)—INCORPORATION BY REFERENCE.**

The rule applied that later parts of an indictment may incorporate the details of matters properly set out in the earlier parts by reference, subject, however, to the rule that duplicity and repugnancy must be avoided.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 270, 270½; Dec. Dig. § 99.*]

**9. MONOPOLIES (§ 10\*)—RESTRAINT OF TRADE—STATUTES—CONSTRUCTION.**

Sherman Anti-Trust Act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) is subject to the rule that statutes are not to be interpreted to change the common law except so far as a purpose to do so is necessarily implied; therefore it is *held*, that the act was not intended to prohibit those minor contracts in partial restraint of trade which the common law had affirmed as reasonable, but was to be construed in accordance with the common law, developed along reasonable lines in accordance with modern commercial advance.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. § 10.*]

**10. MONOPOLIES (§ 20\*)—COMBINATION IN RESTRAINT OF TRADE—NONCOMPETING INDUSTRIES.**

Combination of several corporations, each selling or leasing machinery intended for different operations, not competing, but supplementing each other, does not ordinarily constitute a monopoly in restraint of trade.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

**11. COMMITTEE OF PRIVY COUNCIL—DECISIONS—CONCLUSIVENESS—MONOPOLIES —DEMURRER.**

The business of the United Shoe Machinery Company is conducted by a system of leases, which are substantially the same as those described in United Shoe Machinery Company v. Brunet [1909] App. Cas. 330. It is claimed in these indictments that the provisions of these leases are unreasonable, and unlawfully operate to build up the alleged monopoly of the United Shoe Machinery Company. It is claimed by the respondents that United Shoe Machinery Company v. Brunet should be applied here, and that in harmony therewith the leases in question here should be declared valid. United Shoe Machinery Company v. Brunet was decided by a very able court, yet it was a decision of the judicial committee of the Privy Council, and therefore not authoritative as the decisions of the established courts of Great Britain. Independently of these considerations, the pleadings in these indictments do not permit us to so apply on this demurrer United Shoe Machinery Company v. Brunet to such extent as to support the demurrer.

Sidney W. Winslow and others were indicted for violating the Sherman Anti-Trust Act. On demurrers to indictments. Sustained in part and overruled in part.

Asa P. French, U. S. Atty., Edwin H. Abbot, Jr., Sp. Asst. U. S. Atty., William S. Gregg, Sp. Asst. Atty. Gen., James A. Fowler, Asst. Atty. Gen., and Oliver E. Pagan.

Charles F. Choate, Jr., of Boston (Olcott O. Partridge, of Boston, on the brief), for defendants Winslow, Hurd and Brown.

Henry F. Hurlburt and Boyd B. Jones, for defendants Barbour and Howe.

William A. Sargent, of Boston, for all defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

PUTNAM, Circuit Judge. [1] These cases came before us on demurrer. They are indictments based on the act of July 2, 1890 (26 Stat. 209, c. 647), commonly known as the "Sherman Anti-Trust Act." No. 114 seems to be less complicated by special circumstances than No. 113. We will therefore take up that first. It contains two counts. The first is based on the second section of the act referred to, relating to monopolies; and the second on the first section, which declares illegal certain contracts and combinations or conspiracies in restraint of trade, and punishes "every person who shall make any such contract or engage in any such combination or conspiracy." The second section of the act impliedly permits an indictment for building up a monopoly, as well as inaugurating it or maintaining it, and therefore may relate to a series of acts following each other, all covered into one indictment or count, without the indictment or count being chargeable with duplicity. The offense under the first section permits in one count an allegation of only a single transaction—that is, an allegation of making one contract, or engaging in one combination or conspiracy—so that while by virtue of the decisions of the Supreme Court in United States v. Kissel, 218 U. S. 601, 607, 31 Sup. Ct. 124, 54 L. Ed. 1168, and United States v. Barber, 219 U. S. 72, 78, 31 Sup. Ct. 209, 55 L. Ed. 99, such a combination or conspiracy, when once effected, may be continuous, yet only one contract or one conspiracy can properly be alleged in any one count. For this reason, as we go on, we will find that the second count, under the circumstances of the case, must be held invalid in law.

There is such a chaos of decisions in reference to the Sherman Anti-Trust Act, and such a chaos of understanding or misunderstanding with reference thereto, and this case apparently is regarded as of so important a character, that any conclusions a single judge may reach may prove of very little importance. It is not for the court here to judge of the possibility of a writ of error lying in these cases to the Supreme Court, but it is hoped by the court that such may be permissible. The court, moreover, cannot overlook the fact, in accordance with the practice shown in United States v. N. Y., N. H. & H. R. Co. (C. C.) 165 Fed. 742, decided on December 4, 1908, that the United States, under the act approved February 11, 1903 (32 Stat. 823 [U. S. Comp. St. Supp. 1909, p. 1211]), have the privilege of demanding, on a bill in equity, the constitution of a court of three judges to pass on the issues fundamentally involved here; of course, much broadened out and made much more certain as they would be on a bill in equity. Also, the court, having a right to know its own records, cannot overlook the fact that such a bill in equity is pending in this district, subject to be advanced for hearing in accordance with the statute last named. Nevertheless, the court, being appealed to as the parties have a right to appeal to it, must do its duty as best it can.

[2] It will turn out that, notwithstanding the apparent conflict, and and as we say chaos, of decisions, there is a clear path through them all to a satisfactory determination of the fundamental question involved here. It may be found, however, that certain incidental matters are proposed as to which there is uncertainty necessarily involved by rea-

son of the multiplicity of the allegations relating thereto; and as to these the court reserves to itself the right to appeal to Kansas v. Colorado, 185 U. S. 125, 145, 147, 22 Sup. Ct. 552, 46 L. Ed. 838. The rule there is stated with reference to suits in equity where the issues are raised on demurrer; but it is equally applicable, on fundamental principles, to a criminal proceeding. In complicated cases demurrers sometimes shut out the merits, and sometimes, so far as the case involved is concerned, bring before the court only a partial and inadequate view thereof. It is with great satisfaction that we may rely on the rule from Daniell stated in Kansas v. Colorado, 185 U. S. at pages 144 and 145, 22 Sup. Ct. at page 559, 46 L. Ed. 838, as follows:

"The pursuit of this course, on occasion, is thus referred to by Mr. Daniell (p. 542): 'The court sometimes declines to decide a doubtful question of title on demurrer, in which case the demurrer will be overruled, without prejudice to any question. A demurrer may also be overruled, with liberty to the defendant to insist upon the same defense by answer, if the allegations of the bill are such that the case ought not to be decided without an answer being put in. * * * A demurrer will lie wherever it is clear that, taking the charges in the bill to be true, the bill would be dismissed at the hearing; but it must be founded on this: that it is an absolute, certain, and clear proposition that it would be so; for if it is a case of circumstances, in which a minute variation between them as stated by the bill and those established by the evidence may either incline the court to modify the relief or to grant no relief at all, the court, although it sees that the granting the modified relief at the hearing will be attended with considerable difficulty, will not support a demurrer.'"

The conclusion of the court, stated in 185 U. S. at page 147, 22 Sup. Ct. at page 560, 46 L. Ed. 838, was as follows:

"The result is that, in view of the intricate questions arising on the record, we are constrained to forbear proceeding until all the facts are before us on the evidence. Demurrer overruled, without prejudice to any question, and leave to answer."

There have been brought to our attention two decisions in this district, one of them, Oliver v. Gilmore (C. C.) 52 Fed. 562, rendered independently of any question arising under the statutes of the United States, and the other, United States v. Patterson, rendered June 1, 1893, reported in (C. C.) 55 Fed. 605, and again in (C. C.) 59 Fed. 280. As the theory of the latter case has never been approved, we will not refer to it further; but the former case, Oliver v. Gilmore, deserves some consideration, as we will state later.

[3, 4] The incidental questions we will dispose of now. It is objected that the respondents are joined as officers of various corporations around which this litigation gathers, that one corporation is the principal, and that the respondents are only officers or directors thereof. The indictment, however, expressly charges them as actors, and two fundamental principles are thoroughly settled. One is that neither in the civil nor the criminal law can an officer protect himself behind a corporation where he is the actual, present, and efficient actor; and the second is that all parties active in promoting a misdemeanor, whether agents or not, are principals. The rule distinguishing between directors of a corporation who are simply charged as such and directors acting an immediate, special part in the proceed-

ings in question, was pointed out and settled by the Circuit Court of Appeals for this circuit in National Cash Register Company v. Leland, 94 Fed. 502, 508, 509, 37 C. C. A. 372. Although that was a civil suit for damages on account of an infringement of a patent right, the principles apply here as well as there.

[5] Some questions are also made with reference to the method of setting out certain documents involved here. There are a great many documents all of the same class relied on by the United States. None of them is specifically described, nor any allegations beyond describing the substance thereof as understood by the United States. We may return to this later if we find it necessary; but all we need say at present is that, where whatever are involved are so numerous that they cannot be stated at length, or in detail, without incumbering the record to an extent beyond all practical rules of convenience, they may be stated generally. Also, as ruled by the Circuit Court of Appeals for this circuit in Pooler v. United States, 127 Fed. 509, 517, 62 C. C. A. 307, and by the Circuit Court in United States v. Grunberg (C. C.) 131 Fed. 137, 139, it is not ordinarily necessary to set out an instrument by its tenor unless it becomes directly the subject-matter of the litigation.

We will not notice particularly all the other propositions made by the respondents, which are numerous; but we will touch upon them so far as we think they require attention, grouping in our observations sometimes several minor propositions made by the respondents, classifying as far as possible those relating to similar topics.

The counts contained in each of the two indictments, which are based on the first section of the act in question, declaring illegal combinations or conspiracies in restraint of trade, are objected to, with several forms of expression of the objections, because they do not suitably charge in what manner interstate commerce was in fact unreasonably restrained. In this respect the respondents rely on expressions made by us in United States v. John Reardon & Sons Company (C. C.) 191 Fed. 454, 456, in reference to the same statute now under discussion, to the effect that:

"The fundamental rule, which never has been overthrown by the Supreme Court, although there are undoubtedly numerous expressions which would seem to shake it, is that it is never sufficient to allege that an act is illegal, but the United States must allege something more which the court can see on the face of the indictment is illegal if the facts are proven as alleged."

[6] We stand firmly by this proposition; yet, as the offense under the first section requires only charging the combination in some form or other, with at most only an allegation of an overt act, it is not necessary to show that the purpose of the combination was accomplished, and therefore objections of the character just stated are not effectual. It is nevertheless objected that the methods contemplated by these combinations are not properly set forth within the general rule cited from our prior decision. We observe that, of course, while as with reference to other alleged criminal acts, the intent must be sufficiently set out to show malice in fact or in law, so in these cases such intent must be set out; and this has been done. Of course, the court fully understands the other settled rule of law that the use of

adjectives and adverbs, no matter how much reiterated, is not sufficient, although required; and also that facts enough must be stated in detail to enable the court to determine for itself whether or not the alleged combination or conspiracy is to be carried out by what are in truth unlawful methods. We think as we leave this case it will be free from all objections in the latter behalf.

It was claimed at the arguments that there is not a sufficient allegation establishing the jurisdiction in this district; but it is plainly inferable from all that is stated in the indictment that the formation of the conspiracy was within this district. This topic, as thus presented to us, is within section 954 of the Revised Statutes (U. S. Comp. St. 1901, p. 696), and is so far a matter of form that it should have been specially set out in the demurrer. Whether it was or not has not been brought to our attention.

It is also said that the United Shoe Machinery Company, the organization which lies at the basis of these indictments, was created under the laws of New Jersey, and that certain allegations with reference to its organization in the state of Massachusetts are repugnant; but the criminal law is not hampered by considerations of this character, and it looks through all such forms, regarding them rather as possibly ineffectual evasions.

[7] Also a question of constitutionality is raised on the ground that what is known as the Sherman Anti-Trust Act is too indefinite to lay the foundation of a criminal proceeding. It is true that the Constitution of the United States requires that, in all criminal prosecutions, the accused "shall be informed of the nature and cause of the accusation" (Amend. art. 6), and that this applies, not merely to the information or indictment, but to the statutory provisions on which the proceeding is based. It must not be forgotten that the framers of the Constitution of the United States, and of the earlier state Constitutions, lived at a time when the recollection of the cruelties of tyrannical proceedings, and the suffering and injustice coming therefrom, were fresh, and, to a large extent, topics of consideration, and when the provisions of constitutional law necessary to protect against such had been thoroughly thought out. In this aspect the framers of these constitutions were vastly more alive to the necessity of provisions of the kind we have quoted, and other like provisions, than the present generation. The favorite resources of tyrants were punishing alleged crimes which had no existence prior to the punishment, and arresting and holding in imprisonment for indefinite periods, and afterwards forfeiting both property and life, without furnishing those charged any knowledge of the charges laid against them; and the same men who framed these constitutions soon learned from immediate contact with the bloody revolution in France that, for all injustice and cruelties, excited or prejudiced multitudes are more pitiless than monarchs, emperors, czars, and all individual tyrants. Consequently, looking at the experience of our forefathers more than at our own, it is the duty of courts and of communities to stand firm in behalf of constitutional provisions such as we have quoted, and more especially in behalf of those dividing the

government into departments as an absolute preventative against those who make charges, and prosecute them, becoming directly or indirectly the judges. We have lived in so much peace for more than a century under the protection of the constitutional provisions to which we refer that whole masses of citizens and some of their leaders are slumbering in. reference to them, while our forefathers, who were brought into almost immediate contact with all the devices to which tyranny was accustomed, were fully awake. The courts, however, are not permitted to slumber. We nevertheless know of no case where statutes have been so general or loose as to have been held to violate the constitutional provision on which the respondents here rely. Moreover, the facts are supposed to be known to the respondents. They are chargeable also, according to the usual assumption of law, with knowledge of the law. Therefore, the facts being alleged in detail in the indictment, the respondents are supposed to be advised fully of what is intended to be charged against them. Certainly it is not so plain that the statute so violates the Constitution as to justify us in holding it unconstitutional in the absence of any adjudication by the Supreme Court.

Nevertheless, while in theory the respondents are chargeable as we say, yet, in fact, the practical application of this branch of the law is very uncertain. The Supreme Court has undertaken to define it in part in Oregon Steam Navigation Company v. Winsor, 20 Wall. 64, 22 L. Ed. 315, already referred to, which in Oliver v. Gilmore (C. C.) 52 Fed. 562, already referred to, we supplemented by further classification. The history of the law as shown in these two cases, and also in the Standard Oil Company v. United States, 221 U. S. 3, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, is in a continuous state of development, and will undoubtedly so remain for an indefinite period. This makes it practically so indefinite, both under the statute in question and aside from it, that criminal prosecutions like this at bar impose great hardship by terrorizing very considerable portions of the community who have acted honestly, through the possible peril of enormous fines, and terms of imprisonment even for very many years. Under the circumstances, we are unable to understand why the department of justice directs, and the President permits, criminal proceedings like this, until, in the particular case, the practical application of the statute has been settled by civil proceedings, in view especially of the fact that the flexible methods of bills in equity are capable of exploiting all doubtful questions much more thoroughly, and with more just results, than criminal proceedings.

The respondents claim that the indictments do not allege sufficiently that they were engaged in interstate commerce within the meaning of the Sherman Anti-Trust Act. They seem to rest this mainly upon the fact that they are leasing machinery instead of selling it; but this fails so entirely to impress us that we do not dwell on it. On the whole, we are not much impressed with the respondents' criticisms so far as they relate to mere matters of form, with a single exception which we will immediately state.

Of course, in a case of this nature under a new statute, the prec-

edents, whether in text-books or decisions, do not furnish standard forms of indictments, and there will be a great variety of forms of expression and methods of arrangement among different pleaders; but we are struck in the present case with the apparent frankness on the part of the United States in attempting to bring before us exactly the facts as they exist, or as they claim them to be, and we think they have done so. We may, however, as well say it now, that we must reject the third count in indictment 113. That count, with certain general statements, describes the pith of the alleged offense as follows:

"And under the circumstances and conditions in said first and second counts set forth with reference to said trade and commerce and the subjects thereof (the allegations of said first and second counts in that behalf, including the allegations as to knowledge, intent and design on the part of said defendants, and as to methods adopted and used by them, being by reference incorporated into this count of this indictment as fully as if herein repeated)."

[8] Modern practice fully justifies references in the later parts of an indictment to earlier parts of the same indictment for the details of matters properly set out in the earlier parts, and this has been correctly done with reference to the second count in indictment 114; but this practice is subject to the fundamental rules of pleading that duplicity and repugnancies must be avoided. The trouble here is as follows:

We have studied the first and second counts in this indictment with the view of ascertaining the necessity of the second count and wherein it differs from the first count; and we have been unable in what study we have given them to analyze them with certainty in this respect. They are apparently looking generally to the same circumstances, so that all we have been able to do is to adopt the explanation of the United States in its supplemental brief in this respect. It alleges that the facts in the second count are substantially similar to those set out in count 1, with such changes as were necessary to charge a conspiracy to restrain the interstate trade of shoe manufacturers by restricting their liberty of purchase in the shoe machinery markets. The arguments at the bar, however, as well as the supplemental brief for the United States, give us the understanding, as in fact it is stated in that brief, that the merger described in the first count created a combination which improperly restrained the defendants themselves in the management of their respective portions of interstate commerce. Consequently the references to the first two counts inevitably inject into the third count allegations which, combined into one count, involve serious difficulties arising from duplicity and repugnancies, inasmuch as restraint of commerce of manufacturers of machines as among themselves, and restraint of commerce generally with reference to purchases from those manufacturers, are in law essentially different things; and the facts leading up to them are therefore necessarily different in certain essential features. The respondents were entitled to meet in the third count clear and consistent allegations in accordance with the fundamental rules of pleading. As this is not vouchsafed them, the third count of indictment 113 must be held, for these special reasons, insufficient in law.

We have now reached the point where we can state the substance of what we have under consideration. The supplemental brief for the United States, filed by leave of court on February 21, 1912, says that the initial design of the respondents was to be carried into effect as follows:

"Every count charges that such initial design was carried into effect by means (1) of the union of formerly independent units of interstate commerce in the United Shoe Machinery Company; (2) by means of the system of leases with their tying provisions."

No other fundamental propositions in this connection are stated; and in this particular the brief expresses a result which we had reached by sifting at the conclusion of the arguments made before us whatever was submitted to us therein. We will therefore confine our attention to these two elements, with some subordinate matters which we may feel called on to discuss.

The letter of the statute under consideration contains no qualification whatever, but is aimed at every contract in restraint of trade, and every monopoly, affecting interstate commerce. The only difference in the letter is that the second section, which relates to monopolizing, uses the words "in part," while the first section omits those words. Nevertheless, there can be no question that both sections, so far as this particular is concerned, are to be construed in the same way. The words "in part" are not in the first section, because a conspiracy in restraint of trade in part is inevitably a conspiracy in restraint of trade within the letter of the section. Therefore, neither in determining the matters involved in this litigation nor in weighing the authorities pro and con can any distinction be made in that behalf. Nevertheless, in the other particulars, with reference to the letter of the statute, it is inevitable that there should be some qualification which does not appear on its face. Otherwise, contracts in restraint of trade, and also monopolies, which have always been regarded as innocent and useful, would be denounced to an extent which would demoralize commerce, and utterly defeat the very purpose for which the statute was intended; that is, to advance commerce, and not to destroy it. Restraint is often mere regulation, or temporary obstruction, for the purpose of clearing out the channel, and letting the stream flow at full tide. In these particulars the law is not prophetic as to the results of what merchants and manufacturers propose, except so far as it can learn from experience; and in Oregon Steam Navigation Company v. Winsor, 20 Wall. 64, 22 L. Ed. 315, already cited, the Supreme Court approved a contract which created a complete monopoly, so far as could then be foreseen, of steam navigation along the whole coast of California, and approved a contract restraining that trade for a specific number of years. This was an emphatic illustration of the condition of things which the Sherman Anti-Trust Act found; and the case demonstrates what mischief it might do if interpreted literally. Other examples in the same direction are always close at hand. Oregon Steam Navigation Company v. Winsor, ubi supra, contained several, including the suggestion, at foot of page 67 of 20 Wall. (22 L. Ed. 315), in reference to portioning out the country in regard to a secret

formula, a suggestion carried into practical effect in Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67. Oliver v. Gilmore, already cited, and which we have said was based on Oregon Steam Navigation Company v. Winsor, is more abundantly illustrative, and attempts to classify. It is interesting in its description of the development of the law given by Lord Justice Fry than whom no one in England knew it better, although it must be said that we have not advanced in the United States so far as the famous Mogul Case (54 L. J. Q. B. 540).

[9] Independently of this, there is the well-settled rule that statutes are not to be interpreted to change the common law, except so far as a purpose so to do is necessarily implied. As said by Mr. Justice Brewer with reference to this same statute in Northern Securities Company v. United States, 193 U. S. 197, 361, 24 Sup. Ct. 436, 466 (48 L. Ed. 679), decided March 14, 1904: "Whenever a departure from common-law rules and definitions is claimed, the purpose to make the departure should be clearly shown." In fact, this rule of construction is so universally recognized, and so fundamental, that we need only call attention to it in this connection. The contrary understanding seems to have been a long time cultivated as a result of what appears in connection with United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, decided March 22, 1897, although it is sometimes said that that understanding was only the reporter's law, in view of the headnote stated as follows:

"The prohibitory provisions of the said act of July 2, 1890, apply to all contracts in restraint of interstate or foreign trade or commerce without exception or limitation; and are not confined to those in which the restraint is unreasonable."

In this case of nine judges only five concurred in the result, one of whom was Mr. Justice Brewer; so that, at the best, the conclusion was that of only five judges against four. But Mr. Justice Brewer, in connection with the expression we have cited from him, vigorously maintained that, although he united with the majority in the Freight Association Case, the statute in question was leveled only at unlawful restraints and monopolies; and he added that:

"Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable, and ought to be upheld."

He continued:

"The purpose rather was to place a statutory prohibition with prescribed penalties and remedies upon those contracts which were in direct restraint of trade, unreasonable and against public policy."

Then follows what we have previously cited from him.

However, all this discussion is rendered unnecessary by the exposition of the law in Standard Oil Company v. United States, 221 U. S., 31 Sup. Ct., 55 L. Ed., 34 L. R. A. (N. S.), already cited, to the effect that the statute has not revoked the common law in the particulars of which we have spoken, but has left it as stated in Oregon Steam Navigation Company v. Winsor, and Oliver v. Gilmore, and by Mr. Justice Brewer in the citations made from him. This ap-

pears all through the opinion of the Chief Justice, but is intensified by the following references, to wit: Referring to the expressions found in the statute "restraint of trade" and "monopolies," it says in 221 U. S. at the top of page 51, 31 Sup. Ct. 512, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834:

"It is certain that those terms, at least in their rudimentary meaning, took their origin in the common law, and were also familiar in the law of this country prior to and at the time of the adoption of the act in question."

Near the top of page 59 of 221 U. S., 31 Sup. Ct. 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, the opinion is more emphatic with reference to the common-law definitions, as follows:

"Let us consider the language of the first and second sections, guided by the principle that where words are employed in a statute which had at the time a well-known meaning at common law, or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary."

A full exposition is found in 221 U. S. on page 60, 31 Sup. Ct. on page 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, as follows:

"And as the contracts or acts embraced in the provision were not expressly defined, since the enumeration addressed itself simply to classes of acts, those classes being broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce, or the subjects of such commerce, and thus caused any act done by any of the enumerated methods anywhere in the whole field of human activity to be illegal if in restraint of trade, it inevitably follows that the provision necessarily called for the exercise of judgment which required that some standard should be resorted to for the purpose of determining whether the prohibitions contained in the statute had or had not in any given case been violated. Thus not specifying, but indubitably contemplating and requiring a standard, it follows that it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided."

In order, moreover, to understand what the opinion meant by its reference to the standard of reason which had been applied at the common law, and for which, unfortunately, the short expression "rule of reason" has been substituted, we quote at length from 221 U. S. pages 58 and 59, 31 Sup. Ct. 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, as follows:

"Without going into detail, and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but, on the contrary, were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public, and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy. It is equally true to say that the survey of the legislation in this

country on this subject from the beginning will show, depending as it did upon the economic conceptions which obtained at the time when the legislation was adopted or judicial decision was rendered, that contracts or acts were at one time deemed to be of such a character as to justify the inference of wrongful intent which were at another period thought not to be of that character. But this again, as we have seen, simply followed the line of development of the law of England."

Returning for an instant to the short expression "rule of reason," found in the opinion from which we have quoted, which, without the context, is misleading, it simply is in line with what was said by Blackstone in an exaggerated manner, that some lawyers tell us that the law is the perfection of reason. It was merely a short way of expression to the effect that the present state of the common law on that topic is the result of development along reasonable lines, and hand in hand with modern commercial advance.

We are now in position to explain in detail the facts so far as they are concerned with the two principal points which we have to consider, namely, the fundamental nature of the original combination and the alleged abnormal and oppressive nature of the leases referred to. The facts as to the combination are alleged in the first count, indictment 114, to have been as follows, namely, the defendants—

"continuously and at all times during the period of time from the 7th day of February in the year 1899 to the 19th day of September in the year 1911, and therefore continuously, and at all times during the three years next preceding the finding and presentation of this indictment, at said Boston, in the manner and by the means hereinafter described, unlawfully and knowingly have monopolized part of the trade and commerce among the several states of the United States—that is to say, the trade and commerce hereinafter mentioned and described, * * * and that continuously for many years prior to and throughout said period of time there has been carried on an extensive industry, consisting of the manufacture and sale of certain articles of merchandise, to wit, boots and shoes, in the following cities and towns in the several states of the United States, to wit."

Then follows a long list of the cities and towns referred to. The indictment then continues:

"Which said articles of merchandise, prior to and throughout said period of time, have been manufactured almost entirely by the aid and use of various kinds of essential machinery, which for the purposes of this indictment are grouped as follows:

"(Group I)—Lasting Machines—The machines included in this group are designed and used for the purpose of lasting the uppers of shoes.

"(Group II)—Welt Sewing Machines and Outsole Stitching Machines—The machines included in this group are designed and used for the purpose of sewing the seam which attaches the upper to the outsole of a turn shoe, and the seam which attaches the upper and welt to the insole of a welt shoe, and for sewing the welt of a welt shoe to its outsole.

"(Group III)—Heeling Machines—The machines included in this group are designed and used for preparing and attaching the heels of shoes.

"(Group IV)—Metallic Fastening Machines—The machines included in this group are designed and used for the purpose of preparing and inserting metallic fastenings in shoes."

The indictment then further states the facts as follows:

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that for many years prior and down to said seventh day of February,

in the year eighteen hundred and ninety-nine, several separate corporations, operating independently, and in competition with each other, were engaged in trade and commerce among the several states of the United States in the sale and lease of the machines included in said groups of shoe machinery, and that among the said corporations engaged in said industry were the following, to wit:

"Goodyear Shoe Machinery Company, corporation of the state of Maine, with its principal factory at said Boston, was engaged in interstate trade and commerce in the sale and lease of machines designed and used for the purpose of sewing the uppers to the soles of shoes, and machines designed and used for the purpose of lasting the uppers of shoes. The said machines are included in groups I and II, aforesaid.

"Consolidated & McKay Lasting Machine Company, corporation of the state of Maine, with its principal factory at Beverly, in said District of Massachusetts, was engaged in interstate trade and commerce in the sale and lease of machines designed and used for the purpose of lasting the uppers of shoes. The said machines are included in group I, aforesaid.

"McKay Shoe Machinery Company, corporation of the state of Maine, with its principal factory at Winchester, in said district of Massachusetts, was engaged in interstate trade and commerce in the sale and lease of machines designed and used for preparing the heels and for attaching them to shoes, and in the sale and lease of machines designed and used for the purpose of metallic fastenings. The said machines are included in groups III and IV, aforesaid.

"Eppler Welt Machine Company, corporation of the state of Maine, with its principal place of business at said Boston, was engaged in interstate trade and commerce in the sale and lease of machines designed and used for the purpose of sewing the uppers to the soles of shoes, which said machines were particularly adapted to the manufacture of welt and turn shoes. The said machines are included in group II aforesaid.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that prior to and until said seventh day of February, in the year eighteen hundred and ninety-nine, the several companies hereinbefore mentioned and described, sold and leased in the aggregate eighty-five per cent. of all the machines included in all of said groups of shoe machinery so sold and leased to manufacturers of shoes engaged in business in the several states of the United States, but no one of said companies sold and leased or controlled the sale and lease of a majority of all the machines included in all of said groups."

Then follow allegations that prior to the 7th of February the several respondents were severally engaged in promoting the groups already referred to, and which are concerned. Then the indictment proceeds as follows:

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that on said seventh day of February, in the year eighteen hundred and ninety-nine, said defendants Sidney W. Winslow, William Barbour, Edward P. Hurd, Elmer P. Howe, George W. Brown and James J. Storrow, in pursuance of agreements among them to eliminate all competition, which, for a number of years prior to said date, had existed among said Consolidated and McKay Lasting Machine Company, Goodyear Shoe Machinery Company, McKay Shoe Machinery Company, and Eppler Welt Machine Company, and as a device and means for monopolizing, and whereby they have monopolized the trade and commerce among the several states of the United States in the sale and lease of the machines included in each and all of said groups of shoe machinery, caused to be organized and took an active part in the organization of United Shoe Machinery Company, a corporation, under the laws of the state of New Jersey, hereinafter in this count of this indictment referred to as United Company, with broad powers under its charter to manufacture, buy, sell, lease, operate and deal in and with all kinds of machinery, tools, and implements, and especially in everything in any way connected with or useful in the manufacture of shoes, which said United Company, either imme-.

diately or soon after its organization, acquired and took over (the exact date of such acquisition being to the grand jurors unknown) substantially all of the capital stock and the business and assets of each said Consolidated and McKay Lasting Machine Company, Goodyear Shoe Machinery Company, McKay Shoe Machinery Company and Eppler Welt Machine Company, by means of the issue and exchange of the capital stock of said United Company.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said defendants, through said United Company, after its organization, to wit, on or about said seventh day of February, in the year eighteen hundred and ninety-nine, and upon the acquisition by said United Company of substantially all of the capital stock and of the business and assets of each said Consolidated and McKay Lasting Machine Company, Goodyear Shoe Machinery Company, McKay Shoe Machinery Company and Eppler Welt Machine Company, then acquired control of eighty-five per cent. of the trade and commerce among the several states of the United States in the sale and lease of each and every machine included in each and all of the said groups of shoe machinery."

The indictment further alleges:

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that said defendants have, throughout said period of time, carried on, directed and controlled, and caused to be carried on, directed and controlled their said trade, and commerce in the sale and lease of the machines included in said groups of shoe machinery, by the device and means of and through and in the names of said United Company, corporation as aforesaid, and United Shoe Machinery Corporation, a corporation of the state of New Jersey, and through certain other corporations which said defendants dominate and control."

Then follows a list of minor companies of which the United Shoe Machinery Company is said to have obtained control.

The foregoing completes the picture of the combination sought to be penalized under the Sherman Anti-Trust Act. It is to be noted that this count of indictment 114 claims that the combination of the four groups of machinery which we have described was intended to suppress competition; but the detailed facts therein overrule this alleged purpose, and shut out suggestions of an intention in the way of suppressing competition, as we will show.

[10] The alleged agreement was the combination of several interests controlling the various groups I, II, III, and IV. Admitting that each was controlled by a separate organization without any cross-holding, it would have been clear that the result would have been simply a union of four different industries, not competing, but supplementing each other. A careful examination of the record shows, however, that, although the Goodyear Company, the McKay Shoe Machinery Company, the McKay Lasting Company, and the Eppler Welt Company nominally controlled independently of each other shares in the business to which groups I and II were related, yet the cross-holdings of the respondents in these corporations prevented any competition prior to February, 1899, so that the status was the same as though groups I and II formed one group, and only groups III and IV were separate and independent groups. No complaint whatever is made in the indictment of the grouping in the way stated; and, more by way of illustrating our line of reasoning than for anything else, we will add here that in indictment 113, which seems to

assume that the various machines to which these indictments relate were covered by patents, it is expressly admitted that the original groups I, II, III, and IV controlled monopolies, and that yet those monopolies were not of an illegal character.

Taking up again the second count in indictment 114, which refers back for all details to the first count, it plainly alleges only a conspiracy. It states that the respondents "unlawfully and knowingly conspired to monopolize." This expression is plainly adapted to a combination only. Therefore we accept this count as such, leaving the first count of indictment 114, which we will approach later, as alleging a completed monopoly under the second section of the act.

Coming back, therefore, to the proposition that the second count alleges only a conspiracy, the rules of pleading confine it to one conspiracy. As said in United States v. Kissel, 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168, ubi supra, and according to the clear rules of law, it may well be regarded as a continuous conspiracy. Nevertheless, as was said in 218 U. S. on page 608, 31 Sup. Ct. on page 126, 54 L. Ed. 1168, "the contract is instantaneous," though "the partnership may endure as one and the same partnership for years"; adding, "a conspiracy is a partnership in criminal purposes." Therefore it follows that the whole offense under the second count of indictment 114 is a combination formed on the 7th day of February, 1899, with the purposes and intentions then existing which we have described, and nothing more. This combination, then formed, was purely an economic arrangement, not in violation of any rule in restraint of trade at common law, or which has been announced by the Supreme Court, as is shown by an examination of all the cases decided by that tribunal.

It seems to be impossible to deny that the combination of various elements of machinery, all relating to the same art and the same school of manufactures, for the purpose of constructing economically and systematically, and of furnishing any customer, the whole or any part of an entire system, is in strict and normal compliance with modern trade progress; as also it might be in strict compliance with modern progress to limit the manufacture and supply to certain details, as for example, steam gauges, wheels for railroad cars, or axles for steam locomotives, without furnishing anything else, although by so doing, the manufacturer of details becomes able to command the entire market. It is absolutely normal, and in accordance with the rightful demand of the market, for any dealer to supply mere details or an entire system of machinery, according as his customers may desire.

Such being the fact, the law as explained by Chief Justice White in 221 U. S. at page 58, 31 Sup. Ct. at page 515, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, of Standard Oil Company v. United States, has kept hand in hand with "developing trade." The great leaps which the law has made in this direction, and the reasons why it has made them, is pointed out in many cases, especially in Gibbs v. Gas Company, 130 U. S. 396, 409, 9 Sup. Ct. 553, 32 L. Ed. 979, where the leap was from Mitchell v. Reynolds, 1 P. Wms. 181, limited to a

single town or city, to Rousillon v. Rousillon, 14 Ch. D. 351, which covered the whole of Europe as we remember it. At any rate, it covered practically an unlimited territory. In the same line is the distinction made by the Chief Justice in Standard Oil Company v. United States, that the unification of power and control over petroleum there under discussion was due "to the prima facie presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination which were resorted to with the purpose of excluding others from the trade."

So also in United States v. American Tobacco Company, 221 U. S. 106, at page 182, 31 Sup. Ct. 632, at page 649 (55 L. Ed. 663), the Chief Justice distinguished as follows:

"We say these conclusions are inevitable, not because of the vast amount of property aggregated by the combination, not because alone of the many corporations which the proof shows were united by resort to one device or another. Again, not alone because of the dominion and control over the tobacco trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations."

Then follows a number of specifications, among which is this:

"By persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for purposes of trade."

We have examined every decision of the Supreme Court bearing on these topics. Some of them, like Gibbs v. Gas Company, 130 U. S. 396, 409, 9 Sup. Ct. 553, 32 L. Ed. 979, already referred to, and the Freight Association Case, 166 U. S. 290, 335, 17 Sup. Ct. 540, 41 L. Ed. 1007, were decided, or might have been, on the ground that they involved agreements for the suppression of corporations having a public character, which agreements are clearly illegal all over New England. All the other decisions involved a well-known rule which prohibits stifling bids and portioning out territory arbitrarily. In this is included Oregon Steam Navigation Company v. Winsor, already cited, with reference to the excess period of three years explained therein. None of them penalize a combination like that originally formed in the present case. Therefore we cannot adjudge it invalid.

The first count of indictment 114 reaches the case of an alleged completed monopoly, which therefore may include everything, not only the original combination, but whatever occurred down to the time of the finding of the indictment. There are numerous minor matters here which are not covered by either of the two propositions which we have said were specially brought forward in the supplemental brief of the United States; as, for example, the acquiring the "Thomas G. Plant" assets, and several minor corporations. These are only the results, and of themselves add nothing except by way of illustration and aggravation.

What was thus referred to in the supplemental brief of the United States are leases which are declared to be "arbitrary, oppressive and unreasonable." The alleged illegal purpose of the leases is set out

195 F.—38

at full length, and they are denounced as unlawful devices for eliminating competition. It is also urged that, as a result of these leases, in combination with the four groups consolidated as alleged, the respondents have dominated 98 per cent. of the business to which these groups related. We do not attach much importance to this percentage, because that, standing alone, is like one of the terms of an algebraic equation, which of itself is nonefficient. As said in Oliver v. Gilmore, ubi supra, a manufacturer or merchant may, by the mere fact of the quality of his goods, monopolize the market, which is permissible; as for illustration, one of these indictments describes the respondents' machines as the best put on the market.

[11] The leases referred to here are the same as those approved in the appeal of United Shoe Machinery Company v. Brunet (1909) App. Cas. 330, where the Privy Council decided that the whole combination exhibited here, including leases, was valid. Notwithstanding the decisions of the Privy Council are not authoritative, even in England, like those of the King's Bench, yet the members of the judicial committee who sat on this appeal were Lords MacNaughton, Atkinson, Collins, and Gorell, making an exceedingly strong court, hardly to be surpassed in England. Therefore we would be free to follow it if the background was the same here as there. But it is not. There the background was the special findings of a jury, here the indictments allege features going towards making up an illegal monopoly, which are not clearly inoperative on their face; so that we must fall back upon the rule we have cited from Kansas v. Colorado, 185 U. S. 125, 145, 147, 22 Sup. Ct. 552, 46 L. Ed. 838. We can easily see that the result of the trial of the issues of fact might remove the apparent illegality arising from these leases; but the case is not so clear that we can sustain the demurrer with reference to the first count of indictment 114. Therefore on the demurrer we hold the second count of indictment 114 invalid, and the first count thereof valid, unless on a trial it appears that the leases we refer to are found to add no obnoxious feature.

Indictment 113 is easily disposed of. We have already shown that the third count is invalid. The first and second counts are invalid for the same reason which invalidates the second count of indictment 114. This indictment 113 was evidently framed to bring out the question whether the fact that various machines manufactured by the United Shoe Machinery Company are protected by patents in whole or in part is of importance in this connection. As the result we reach cuts under this question, we prefer to postpone its consideration, hoping that the Supreme Court may have to dispose of it in some way before we are forced to proceed with it if ever.

The general result is that on the face of the record we hold the original agreement of consolidation valid, and that on the pleadings we adjudge the condition arising from the subsequent adoption of the leases in question leaves the first count of indictment 114 not subject to demurrer.

The judgment in 113 is as follows:

The indictment is adjudged insufficient in law; the demurrer thereto is sustained; and the respondents go therefrom without day.

The judgment in indictment 114 is as follows:

The first count is adjudged sufficient in law; and the demurrer thereto is overruled; and the respondents are given leave to plead anew on or before the first day of the March term, 1912. The second count is adjudged insufficient in law; the demurrer thereto is sustained; and the defendants go therefrom without day.

## On Petition for Rehearing.

The respondents filed a petition for rehearing, probably claiming it as a matter of right under rule 16; at any rate, we accept it as such. We have to-day entered an order denying the same. Ordinarily it is not desirable to file opinions with reference to such orders, but in the present case one may be advisable.

The petition relies on two propositions: One is that there is an inconsistency on the part of the court in reference to pleading the leases relied on in the indictment. We regret that, instead of quoting authorized expressions, we used a phrase which we thought was substantially clear, and thus, perhaps, misled counsel. Therefore we will repeat in language found in any edition of Archbold's Criminal Pleading, as follows:

"At common law, written instruments, wherever they formed a part of the gist of the offense charged, must be set out verbatim."

Nowhere is it attempted to apply this rule, except with the limitation thus stated. Both the examples given by Archbold, and by other authorities, and what the courts learn by experience in the practical application of this rule, should satisfy any one that the instruments referred to in this petition do not form a part of the gist of the offense charged. Moreover, the petition overlooks the fact that there is another rule which we applied, which is that the multiplicity of the instruments to which the indictment refers, rendered it impracticable to plead them except in a general way.

The other alleged error to which the petition relates is that the first count of the indictment No. 114 so far developed rights covered by letters patent as to bring the case within Henry v. Dick, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. ——, decided by the Supreme Court in the opinion handed down on March 11, 1912. The only point there decided was to affirm a rule with reference to rights of patentees which has been accepted by us since the topic came under discussion; and, as we understand, is as is generally held in this circuit. The line of reasoning in the opinion perhaps develops propositions which may or may not be available for the respondents in defense on a trial of issues of fact, if there is one, under the count indictment No. 114, to which the petition relates, but they are not available on the face of that count.

It ought to be enough to say that at the hearing on the demurrers, to which it must be admitted we gave patient attention, it was not submitted to us that this count in indictment No. 114 showed that the respondents had any peculiar rights or defenses arising out of the patent laws. Even this petition makes a clear distinction between this indictment and the indictment No. 113. This is not only in ac-

cordance with our recollection of the presentation of the case when brought before us, to which it must be admitted we gave the most careful attention; but also it is sustained by one of the briefs for the respondents submitted at that time, wherein, with reference to indictment No. 113, it was stated that all the machines referred to therein were expressly alleged to be covered by letters patent, while the same brief, with reference to indictment No. 114, stated only that its allegations led almost conclusively to the establishment of the proposition that the business was based on patents. According to the fixed rules of criminal pleadings, matters "expressly alleged" and those allegations which lead "almost conclusively" are so wide apart that they are not in the same field at all.

Indictment No. 113 alleges expressly again and again that specific machines are covered by letters patent. On this point the petition before us invites us, at large, to examine five pages, 26, 27, 28, 29, and 30, in indictment No. 114, and again three pages and again four pages, leaving us to search out what the respondents rely on. This is calling on the court for an abuse of time which counsel of the distinction and experience of those at bar should never have done. The court refuses to undertake the task, beyond turning up page 26 referred to, where there is a general charge that the corporation controlled by the respondents acquired "assets and letters patent" without any further specification. As far as the court recollects, there is nothing more definite anywhere in indictment No. 113. This, of course, is not effectual on the proposition now brought before us; and this distinction between No. 114 and No. 113 clearly justifies us in holding that there was no intention at the trial of these demurrers to bring before us the proposition now made. The respondents at that trial had their hearing and their full day at court, and must be content therewith.

On the whole, we repeat that we left the indictment as to which the respondents now complain in the condition which we described in our reference to Kansas v. Colorado, 185 U. S. 125, 22 Sup. Ct. 552, 46 L. Ed. 838; and we are not willing to be turned aside from that position by any further discussion. We must in any view deny the petition.